# UNITED STATES *v.* A. SCHRADER'S SON, INC.

**ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF OHIO.**

No. 567.   Argued January 22, 23, 1920.—Decided March 1, 1920.

A manufacturer of patented articles sold them to its customers, who were other manufacturers and jobbers in several States, under their agreements to observe certain resale prices fixed by the vendor. *Held* that there was a combination restraining trade in violation of § 1 of the Anti-Trust Act. P. 98. *Dr. Miles Medical Co.* v. *Park & Sons Co.*, 220 U. S. 373, followed; *United States* v. *Colgate & Co.*, 250 U. S. 300, distinguished.

264 Fed. Rep. 175, reversed.

THE case is stated in the opinion.

*The Solicitor General* and *Mr. Henry S. Mitchell,* Special Assistant to the Attorney General, for the United States:

The defendant's patents have no bearing on the case. On this point we merely refer to the opinion of the District Court, holding that the decisions of this court establish that patented and unpatented articles are on the same footing with respect to fixing resale prices; that defendant's so-called "license agreements" were mere selling agreements; and that defendant's use of the term "royalties" was merely intended to give color to its untenable theory that the patents justified what was done.

The conclusive interpretation of the indictment (*United States* v. *Carter,* 231 U. S. 492, 493; *United States* v. *Miller,* 223 U. S. 599, 602) was that it charged a system of resale price-fixing contracts, between a manufacturer and wholesalers of its products, obligating the wholesalers to adhere to uniform specified resale prices, eliminating competition between the wholesalers, enhancing their prices to re-

tailers, and enhancing the prices paid by the consuming public.

In *Dr. Miles Medical Co.* v. *Park & Sons Co.*, 220 U. S. 373, this court vigorously denounced a system of resale price-fixing contracts between a manufacturer and dealers in its products, as against the *public* interest, upon the ground that it was as if the dealers had agreed amongst themselves, as condemned in *United States* v. *Addyston Pipe & Steel Co.*, 85 Fed. Rep. 271; 175 U. S. 211, to fix prices and suppress competition.

In *United States* v. *Colgate & Co.*, 250 U. S. 300, the indictment did not charge the defendant with selling its products to dealers under agreements which obligated the latter not to resell except at prices fixed by the company.

The District Court erroneously construed § 1 of the Sherman Act, which prohibits combinations in restraint of trade, as only applying where there is a violation of § 2, which prohibits monopolization. That construction is opposed to the declaration of this court in *Standard Oil Co.* v. *United States*, 221 U. S. 1, 50, 57; nor is it supported by the *Colgate Case*. It is opposed to the *Dr. Miles Medical Case.*

If the statute is to be construed according to the *Dr. Miles Medical Case* as intended to prevent combinations tending to enhance prices paid by the public, the construction adopted by the District Court is untenable. For the tendency to enhance prices paid by the public not only exists in a combination, but is fulfilled although no retailers are included in the combination, but only wholesalers; and the District Court so interpreted the present indictment. The enhancement of the prices at which the wholesalers sell to the retailers is, of course, transmitted by the retailers to the public; and is ultimately borne by the public. It is analogous to the case of a price-fixing agreement between competing manufacturers, which is unlawful although the enhancement of prices is transmit-

ted to the public through dealers not in the agreement with the manufacturers.

The District Court was mistaken in considering that the construction of the Sherman Act which it adopted was supported by § 2 of the Clayton Act (38 Stat. 730). That section has no apparent bearing on resale price fixing. The District Court apparently overlooked that the enactment deals only with a person's selling prices to his customers, and in no way touches his fixing their prices to their customers, which alone is involved in this case.

Large profits can not be justified as reasonable because they encourage the distribution of articles needed by the public; for the principle of that justification would sanction taking advantage of the public necessity, *e. g.*, for coal or food. However, the reasonableness, or unreasonableness, of resale prices does not determine the legal status of the combination which fixes them.

In the *Dr. Miles Medical Case* the combination was condemned, although the court had to assume that the prices fixed were reasonable, as was expressly pointed out. (220 U. S. 412.) See *Thomsen* v. *Cayser*, 243 U. S. 66; *Salt Co.* v. *Guthrie*, 35 Oh. St. 666. All such combinations are injurious to the public interest in the extreme facility which they afford for arbitrarily advancing prices through the united action of the dealers in obedience to the will of the manufacturer. Resale price-fixing combinations are not saved from condemnation by their advantages to the participants. We may dismiss as wholly baseless the familiar contention that to condemn a resale price-fixing combination deprives the manufacturer of the advantage of exercising his undoubted right to suggest resale prices and to select as his customers those dealers who adhere to the suggested prices.

That undoubted right was referred to by this court in the *Colgate Case*. But that indictment was held bad on the ground that it did not charge the existence of agree-

ments obligating the dealers to adhere to the indicated resale prices. The manufacturer can, of course, suggest resale prices and select as his customers dealers who adhere to them, without restricting the dealers either by assurances and promises to so adhere, or by contracts obligating them to do so.

Another inadequate argument for resale price-fixing combinations is that they protect the manufacturer's legitimate interest in the good will of his products against a poor opinion of their value created by dealers selling them at ruinous prices as a bait to procure sales of other articles on which to recoup. Let us assume this practice to be harmful and dishonest, and that the manufacturer may legitimately withhold his goods from dealers addicted thereto. But, obviously, he may protect himself in that respect without creating a combination imposing absolute uniformity of price on all dealers, and thus preventing deviation from such price by efficient dealers who find smaller profits adequate and desire to content themselves with these in a manner that is fair, and honorable, and entirely beneficial to the public.

The real advantages of resale price-fixing combinations to the participants consist in the enhancement of prices which constitutes a disadvantage to the public. A liberal part of the enhanced price is distributed to the dealers in the combination in the form of profits consisting in the difference between their fixed buying prices and their fixed selling prices. This induces the dealers to promote the sales of the articles whose prices are so fixed rather than of other articles the prices of which are not fixed and are consequently kept down by competition amongst the dealers. A manufacturer is, of course, benefited when the dealers promote the sales of his products rather than of other products; and his profits are, of course, increased. But as for such considerations we merely note what this court said in the *Dr. Miles Medical Case* (p. 408), after

condemning resale price-fixing combinations as injurious to the public interest.

*Mr. Frank M. Avery*, with whom *Mr. Eugene V. Myers*, *Mr. Carl Everett Whitney* and *Mr. Earl A. Darr* were on the brief, for defendant in error:

The indictment does not charge an offense. There must be an unreasonable restraint of trade. A covenant in partial restraint is *prima facie* reasonable. *Northwestern Salt Co.* v. *Electrolytic Alkali Co.* (1914), A. C. 461; *Haynes* v. *Doman* (1899), 2 Ch. 13. *Thomsen* v. *Cayser*, 243 U. S. 66, showed an unreasonable combination.

The allegation that the defendant's goods are patented plus an allegation that defendant regularly sells and ships large quantities to tire manufacturers and jobbers in the Northern District of Ohio and throughout the United States, who in turn resell and reship large quantities (collectively stated) to jobbers, manufacturers, retail dealers and the public, falls far short of charging facts showing an unreasonable restraint or combination. The channels of interstate commerce may be glutted with valves, etc.; there may be many or few manufacturers thereof; defendant's agreements may be necessary, owing to the state of the trade in defendant's particular goods; there is no averment to show how many tire manufacturers or jobbers there are in Northern Ohio or in the United States, nor what proportion of them have contracted with defendant; there is nothing to show what percentage of the goods is handled by the retail trade—this retail trade not being restricted at all; there is no allegation as to what percentage of valves is sold by the tire manufacturers or jobbers to the consuming public. Furthermore, no allegation of unreasonableness or of facts upon which unreasonableness can be predicated is found in the indictment itself or as interpreted by the District Court, and the agreements annexed to the indictment show that defend-

ant has an interest in the resale price which it fixes. *Dr. Miles Medical Co.* v. *Park & Sons Co.*, 220 U. S. 373, decides that where a vendor has parted with all of his interest, and has also received the full consideration, he cannot control the resale price. But here, under its license agreements, defendant has a direct and substantial property interest in the resale price, namely, certain percentages of the list prices or gross selling prices, reserved as royalties under its patents. These royalties are in addition to the initial price and are not payable unless and until the goods have been used or sold by the defendant's vendees; and the percentage of the resale price which defendant is to receive is based on the amount of the resale price which the vendee actually receives, which must not be less than a minimum price, but which may be more; and, therefore, the amount of the defendant's compensation is dependent upon the amount of the resale price when the resale comes to be made. In none of the cases which have been before this court did the vendor have this interest or property in the resale price.

Where a vendor has a pecuniary interest in maintaining the resale price, and no monopoly is effected, he may lawfully contract with vendees to adhere to fixed prices. *Dr. Miles Medical Co.* v. *Park & Sons Co.*, *supra*; *Fisher Flouring Mills Co.* v. *Swanson*, 76 Washington, 649; *Rawleigh Medical Co.* v. *Osborne*, 177 Iowa, 208.

At common law such agreements are valid; nothing in the Sherman Act makes them illegal; and this court has made it clear that in the cases heretofore decided it has decided no more than was directly in issue in them.

In each of those cases the vendor had received the full price for his article, all that he ever was to get for it, and still sought to annex conditions to the resale. In the case at bar the defendant has not received the full price for it, since a very substantial part depends upon the resale and upon the amount the resale price. The hypothesis of

the Government assumes that defendant has parted with the title to the goods and therefore has no property interest in the goods when resold.   This overlooks the fundamental fact that the sales are on condition, that, on resale, the vendee will pay the defendant something more. The defendant, under the circumstances, may have only a fanciful interest or no interest in the goods themselves, but it has a very real, substantial and pecuniary interest in the resale price.

It must be remembered that the defendant can legally refrain from any dealing with any person whomsoever and the consequence of this legal right is that if it chooses to deal it can deal on its own terms so long as it does not seek to project itself beyond that line where it does not have a property interest in the thing sought to be accomplished.

Until defendant receives its part of the resale price, the transaction is not without the operation of the patent law.   If, under such circumstances, the patent law and the Sherman Law clash, the patent law will prevail.   *Bement v. National Harrow Co.,* 186 U. S. 70.

Whether title passes when the goods reach the wholesalers is immaterial, the real question being whether the patentee has received the full consideration it charges for releasing the goods from the patent monopoly.   In the present instance, defendant has not received any part of such consideration until after the sale by the wholesaler is made.

We think the District Court overlooked the fact that the patent right concerns itself exclusively with the right of a patentee to control goods in which he has no property interest.   It has been decided many times that the law grants to the patentee no right of manufacture, use or sale which he did not have before.   In other words, with regard to the patented devices which he owns, the law neither subtracts from, nor adds to, them.   It is solely with

the goods which he does not own that the law concerns itself.

*Bauer* v. *O'Donnell*, 229 U. S. 1, announced no new doctrine, but merely an extension of an old one—that a patentee having unconditionally sold and having received the consideration for release from the patent monopoly, could not afterwards control the patented goods. Cf. *Bloomer* v. *McQuewan*, 14 How. 539; *Adams* v. *Burke*, 17 Wall. 453; *Mitchell* v. *Hawley*, 16 Wall. 544. The monopoly not being dependent upon ownership of the goods, it is clear that the mere passage of title, if it really passed in this case, does not take the goods from under the patent monopoly.

In the *Colgate Case* the manufacturer effected a practical price-fixing for his goods in the hands of his customers and could enforce these fixed prices by a refusal to deal with the customers if they did not adhere to them. Such price-fixing, in effect, was held reasonable. The question which then arises is: Would it be a crime under the Sherman Act to secure precisely this effect by means of a written agreement?

It seems to us that the *Colgate* decision is a standard by which the acts of any defendant charged with price-fixing can be measured, and that the Sherman Act should not be construed to make out a crime where the same result is secured, and the only difference is that the customer, instead of acquiescing in what the manufacturer wishes, merely says that he will acquiesce, in writing.

To put the matter in another way, it is a reasonable thing to do under the Sherman Act what a man has a perfect right to do under the general law.

This defendant has effected no result which Colgate did not effect. On the contrary, Colgate went away beyond the effect produced, or even desired, by this defendant. Defendant's main purpose is to obtain a distribution of its goods. When they are in the hands

of the retailers and widely distributed, defendant's interest ceases. The retailers may freely compete. In the *Colgate Case* the goods were in effect controlled by the manufacturer while in the hands of the retailers.

We are aware that there is a technical difference between goods which in theory may be freely sold by the dealer, and goods which in theory cannot be sold by the dealer except at a fixed price. But this distinction is merely a form of words when the actual facts are considered.

Colgate's dealers had the technical right to sell Colgate goods at any price they pleased. As a matter of fact, however, they could not sell them at any price they pleased without incurring the penalty of being unable to get more goods. Colgate's intent and purpose was to fix resale prices. Both the indictment itself and the District Court in the case at bar stated that the effect of Colgate's act was the fixation of prices and the suppression of competition.

We wish to make perfectly clear this point. Is the Sherman Act to be interpreted so that it does not cover this effectual fixation of prices by one who has the intent and purpose of fixing prices and who proceeds to adopt means to secure this result, and at the same time interpreted to include one who has the same intent and purpose and who chooses the same means with the only difference that he secures the written agreement of the dealer to observe the fixed prices? Would this be a reasonable interpretation of the act, to make a man's liberty depend upon a shadow leaving him scot-free to violate the substance of the law?

In the *Miles Case* the price-fixing contracts were so extended and so widespread as to include practically the entire trade, wholesale and retail. Such a complete and perfected system has the elements of monopoly within it and would be so dangerous to the public wel-

fare as to induce the court to believe it unreasonable, under the Sherman Act.

MR. JUSTICE McREYNOLDS delivered the opinion of the court.

Defendant in error, a New York corporation, manufactured at Brooklyn, under letters patent, valves, gauges and other accessories for use in connection with automobile tires, and regularly sold and shipped large quantities of these to manufacturers and jobbers throughout the United States. It was indicted in the District Court, Northern District of Ohio, for engaging in a combination rendered criminal by § 1 of the Sherman Act of July 2, 1890, c. 647, 26 Stat. 209, which declares illegal "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." After interpreting the indictment as indicated by quotations from its opinion which follow, the District Court sustained a demurrer thereto, basing the judgment upon construction of that act.    264 Fed. Rep. 175.

"The substantive allegations of this indictment are that defendant is engaged in manufacturing valves, valve parts, pneumatic-pressure gauges, and various other accessories; that it sells and ships large quantities of such articles to tire manufacturers and jobbers in the Northern District of Ohio and throughout the United States; that these tire manufacturers and jobbers resell and reship large quantities of these products to (a) jobbers and vehicle manufacturers, (b) retail dealers, and (c) to the public, both within and without the respective States into which the products are shipped; that these acts have been committed within three years next preceding the presentation of this indictment and within this district; that the defendant executed, and

caused all the said tire manufacturers and jobbers to whom it sold its said products to execute with it, uniform contracts concerning resales of such products; that every manufacturer and jobber was informed by the defendant and well knew when executing such contracts that identical contracts were being executed and adhered to by the other manufacturers and jobbers; that these contracts thus executed purported to contain a grant of a license from the defendant to resell its said products at prices fixed by it to (a) jobbers and vehicle manufacturers similarly licensed, (b) retail dealers, and (c) the consuming public; that all these contracts provided (that the) [concerning] products thus sold to tire manufacturers and jobbers (provided) that they should not resell such products at prices other than those fixed by the defendant. Copies of these contracts are identified by exhibit numbers and attached to the indictment. It is further charged that the defendant furnished to the tire manufacturers and jobbers who entered into such contracts lists of uniform prices, such as are shown in said exhibits, which the defendant fixed for the resale of its said products to (a) jobbers and vehicle manufacturers, (b) retail dealers, and (c) the consuming public, respectively; and that the defendant uniformly refused to sell and ship its products to tire manufacturers and jobbers who did not enter into such contracts and adhere to the uniform resale prices fixed and listed by the defendant. Further, that tire manufacturers and jobbers in the northern district of Ohio and throughout the United States uniformly resold defendant's products at uniform prices fixed by the defendant and uniformly refused to resell such products at lower prices, whereby competition was suppressed and the prices of such products to retail dealers and the consuming public were maintained and enhanced. . . .

"Thus it will be observed that the contract, combina-

tion, or conspiracy charged comes merely to this: That the defendant has agreed, combined, or conspired with tire manufacturers and with jobbers by the selling or agreeing to sell valves, valve parts, pneumatic pressure gauges, and various accessories, with the further understanding or agreement that in making resales thereof they will sell only at certain fixed prices. It will be further observed that the retailers, to whom the jobbers in ordinary course of trade would naturally sell rather than to the consuming public, and who in turn sell and distribute these articles to and among the ultimate consumers, are not included within the alleged combination or conspiracy. . . .

"The so-called license agreements, exhibited with the indictment, are in my opinion, both in substance and effect, only selling agreements. The title to the valves, valve parts, pneumatic pressure gauges, and other automobile accessories passed to the so-called licensees and licensed jobbers."

The court further said:

"Defendant urges that there is a manifest inconsistency between the reasoning, if not between the holdings, of these two cases [Dr. Miles Medical Co. v. Park & Sons Co., 220 U. S. 373, and United States v. Colgate & Co., 250 U. S. 300]; that if the basic principles announced in the latter case are to be taken in the ordinary sense imported by the language the present case falls within the Colgate Case, and that, properly construed, neither section 1 nor 2 of the Sherman Anti-Trust Law makes the defendant's conduct a crime. The Dr. Miles Medical Company Case standing alone would seem to require that this demurrer be overruled and a holding that the Sherman Anti-Trust Law is violated and a crime committed, merely upon a showing of the making by defendant and two or more jobbers of the agreements set up in the indictment, certainly if the jobbers were competitors in the

same territory. That case has been frequently cited as establishing this proposition. . . . The retailers are not in the present case included. They may compete freely with one another and may even give away the articles purchased by them. No restriction is imposed which prevents them from selling to the consumer at any price, even though it be at a ruinous sacrifice and less than the price made to them by the jobber. Personally, and with all due respect, permit me to say that I can see no real difference upon the facts between the *Dr. Miles Medical Company Case* and the *Colgate Company Case.* The only difference is that in the former the arrangement for marketing its product was put in writing, whereas in the latter the wholesale and retail dealers observed the prices fixed by the vendor. This is a distinction without a difference. The tacit acquiescence of the wholesalers and retailers in the prices thus fixed is the equivalent for all practical purposes of an express agreement. . . .

"Granting the fundamental proposition stated in the *Colgate Case,* that the manufacturer has an undoubted right to specify resale prices and refuse to deal with anyone who fails to maintain the same, or, as further stated, the act does not restrict the long-recognized right of a trader or manufacturer engaged in an entirely private business freely to exercise his own independent discretion as to the parties with whom he will deal, and that he, of course, may announce in advance the circumstances under which he will refuse to sell, it seems to me that it is a distinction without a difference to say that he may do so by the subterfuges and devices set forth in the opinion and not violate the Sherman Anti-Trust Act; yet if he had done the same thing in the form of a written agreement, adequate only to effectuate the same purpose, he would be guilty of a violation of the law. Manifestly, therefore, the decision in the *Dr. Miles Medical Case* must rest upon some other ground than the mere fact that there were

agreements between the manufacturer and the whole-salers. . . .

"The point, however, which I wish to emphasize is that the allegations of this indictment, not alleging any purpose, or facts from which such a purpose can be inferred, to monopolize interstate trade, within the prohibition and meaning of section 2 of the Sherman Anti-Trust Act and the last clause of section 2 of the Clayton Act, does not charge a crime under section 1 of the Sherman Anti-Trust Act as that act should be construed."

Our opinion in *United States* v. *Colgate & Co.* declared quite plainly:

That upon a writ of error under the Criminal Appeals Act, (c. 2564, 34 Stat. 1246) "we have no authority to revise the mere interpretation of an indictment and are confined to ascertaining whether the court in a case under review erroneously construed the statute." "We must accept that court's interpretation of the indictments and confine our review to the question of the construction of the statute involved in its decision." That we were confronted by an uncertain interpretation of an indictment itself couched in rather vague and general language, the meaning of the opinion below being the subject of serious controversy. The "defendant maintains that looking at the whole opinion it plainly construes the indictment as alleging only recognition of the manufacturer's undoubted right to specify resale prices and refuse to deal with anyone who failed to maintain the same." "The position of the defendant is more nearly in accord with the whole opinion and must be accepted. And as counsel for the Government were careful to state on the argument that this conclusion would require affirmation of the judgment below, an extended discussion of the principles involved is unnecessary." And further: "The purpose of the Sherman Act is to prohibit monopolies, contracts and combinations which probably would unduly interfere with

the free exercise of their rights by those engaged, or who wish to engage, in trade and commerce—in a word to preserve the right of freedom to trade. In the absence of any purpose to create or maintain a monopoly, the act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal. And, of course, he may announce in advance the circumstances under which he will refuse to sell."

The court below misapprehended the meaning and effect of the opinion and judgment in that cause. We had no intention to overrule or modify the doctrine of *Dr. Miles Medical Co.* v. *Park & Sons Co.*, where the effort was to destroy the dealers' independent discretion through restrictive agreements. Under the interpretation adopted by the trial court and necessarily accepted by us, the indictment failed to charge that Colgate & Company made agreements, either express or implied, which undertook to obligate vendees to observe specified resale prices; and it was treated "as alleging only recognition of the manufacturer's undoubted right to specify resale prices and refuse to deal with anyone who failed to maintain the same."

It seems unnecessary to dwell upon the obvious difference between the situation presented when a manufacturer merely indicates his wishes concerning prices and declines further dealings with all who fail to observe them, and one where he enters into agreements—whether express or implied from a course of dealing or other circumstances—with all customers throughout the different States which undertake to bind them to observe fixed resale prices. In the first, the manufacturer but exercises his independent discretion concerning his customers and there is no contract or combination which imposes any limitation on the purchaser. In the second, the parties

are combined through agreements designed to take away dealers' control of their own affairs and thereby destroy competition and restrain the free and natural flow of trade amongst the States.

The principles approved in *Dr. Miles Medical Co.* v. *Park & Sons Co.*, should have been applied. The judgment below must be reversed and the cause remanded for further proceedings in conformity with this opinion.

*Reversed and remanded.*

MR. JUSTICE CLARKE concurs in the result.

MR. JUSTICE HOLMES and MR. JUSTICE BRANDEIS dissent.