## Q. R. S. MUSIC CO. v. FEDERAL TRADE COMMISSION.

(Circuit Court of Appeals, Seventh Circuit. April 9, 1926.)

No. 3447.

1. Monopolies ⊂⟹17(1)—Although manufacturer may choose its customers, it cannot by agreement fix price at which retailers will sell products.

Although manufacturer must be accorded unqualified right to choose its customers, it cannot lawfully fix and enforce price at which retailer shall sell its products, by agreement, or equivalent means, though not amounting to agreement.

2. Monopolies ⊂⟹17(1)—Music roll manufacturer may not destroy competition among retailers by agreements for exchange of rolls, in effect fixing price at which retailers may sell rolls (Anti-Trust Act [38 Stat. 730]; Federal Trade Commission Act [Comp. St. §§ 8836a–8836k]).

Under Anti-Trust Act or Federal Trade Commission Act (Comp. St. §§ 8836a–8836k), music roll manufacturer may not destroy competition among retailers by agreements for exchange of rolls, which result in fixing price at which retailer shall sell its rolls.

Petition for Review of Order of Federal Trade Commission.

Proceeding before the Federal Trade Commission whereby the Q. R. S. Music Company was ordered to desist from carrying into effect a certain policy, and the Q. R. S. Music Company petitions to review such order, and the Federal Trade Commission prays for an order of enforcement. Petition denied, and enforcement order granted.

Maurice J. Moriarty, of Chicago, Ill., for petitioner.

W. B. Wooden, of Chicago, Ill., and Adrien F. Busick, of Washington, D. C., for respondent.

Before ALSCHULER, EVANS, and ANDERSON, Circuit Judges.

EVAN A. EVANS, Circuit Judge. Petitioner asks us to set aside an order of the Federal Trade Commission, the material parts of which directed it to "cease and desist from carrying into effect a policy of fixing and maintaining uniform prices at which the articles manufactured by it shall be resold by its distributors and dealers by (1) entering into contracts, agreements, and understandings with distributors or dealers requiring or providing for the maintenance of specified resale prices on products manufactured by respondent; (2) attaching any condition, express or implied, to purchases made by distributors or dealers to the effect that such distributors or dealers shall maintain resale prices specified by respondent; (3) requesting dealers to report competitors who do not observe the resale price suggested by respondent, or acting on reports so obtained by refusing or threatening to refuse sales to dealers so reported; (4) requesting or employing salesmen or agents to assist in such policy, by reporting dealers who do not observe the suggested resale price, or acting on reports so obtained by refusing or threatening to refuse sales to dealers so reported; (5) requiring from dealers previously cut off promises or assurances of the maintenance of respondent's resale prices as a condition of reinstatement; (6) utilizing any other equivalent co-operative means of accomplishing the maintenance of uniform resale prices fixed by the respondent. It is further ordered that respondent, the Q. R. S. Music Company, its officers, directors, agents, servants, and employees, cease and desist from entering into contracts, agreements, or understandings, or making sales or fixing a price charged therefor, or discount from or rebate upon such price, subject as to the condition, agreement, or understanding that the purchaser of respondent's product shall not deal in the goods, wares, or merchandise of any competitor of respondent."

Respondent prays for an order of enforcement.

The story of petitioner's alleged wrongs committed against the public appears in the findings of the commission. We quote therefrom:

"The Q. R. S. Music Company is a corporation * * * engaged in the business

of manufacturing and selling music rolls for player pianos. * * * The great bulk of the music roll product has been known as Q. R. S. player rolls; the letters Q. R. S. having been copyrighted as a trade designation for such rolls. * * * The commercial production of player rolls has developed largely in the past 25 years. Since 1910 such development has been extremely rapid, as shown by the growth of respondent's annual production. According to records produced by respondent, its output in 1910 was approximately 157,000 rolls, valued at $73,752, and in 1920, the banner year of its production, respondent manufactured in excess of 6,200,000 rolls, valued at $3,690,601 *. * * The estimated output of music rolls of the entire industry at the date of hearing herein was between 10,000,000 and 12,000,000. This annual production, contrasted with respondent's production in 1920 of 6,200,000 rolls, gives the respondent a control of well over 50 per cent. of the industry * * *

"Respondent's music rolls * * * are of high quality, and the fact that they are nationally advertised creates a brisk demand for them. Dealers in music rolls for player pianos find their business success in this line promoted by ability to furnish their customers with Q. R. S. player rolls. Respondent sells the great bulk of its player rolls through retail dealers in music, * * * estimated to number about 7,500. * * * Respondent also sells through several jobbers, but not more than 5 to 10 per cent. of its total product is thus distributed. Respondent employs about 35 salesmen, * * *. and issues catalogues, bulletins, or price lists from time to time, listing its said player rolls. It also advertises its products nationally and locally. * * * .

"Its player rolls are priced to dealers by means of price lists and discount sheets. 'Confidential Discount Sheet 1920 Q. R. S. Rolls' provide that 'on purchases under 5,000 rolls in one year the discount is 40 per cent.; on purchases of 5,000 rolls within one year the discount will be 40 per cent. and 10 per cent. The extra 10 will be retroactive and credited to all purchases in 1920. On purchases amounting to 12,000 rolls or more per year the discount will be 50 per cent., applicable as above.' Terms are 30 days net, with an extra 2 per cent. on purchases paid for by the 10th of the month; dealers' payments being in no way contingent upon the sale of the rolls by dealers.

"Respondent has employed in the sale of its Q. R. S. player rolls a policy of fixing and prescribing from time to time the prices at which said player rolls shall be resold by retail dealers.

"(a) As a means of enforcing it, respondent has issued catalogues, price lists, and other literature in which resale prices are suggested, * * * and has caused such resale prices to be placed upon the labels of Q. R. S. player rolls and upon the boxes containing such rolls.

"(b) It has advised dealers, and has let it be known to the music roll trade generally, that it regards its resale price maintenance policy * * * as vital to its business, and that to enforce such policy respondent would refuse to sell to any dealers who had cut the resale price of Q. R. S. rolls fixed by respondent. Such references * * * have been made by respondent in its application blanks used by dealers in initiating their purchases, in circular letters, and in correspondence with the respondent's customers and its salesmen.

"(d) Before listing dealers as 'authorized,' and before selling them Q. R. S. player rolls, a blank application * * * is signed, * * * and near the end of the blank occurs this printed statement: 'Important. The policies of Q. R. S. Music Company must be strictly adhered to in the marketing and retailing of rolls.'

"(e) This application is transmitted by respondent to the dealer with a letter, requesting the applicant to fill out, sign, and return it to respondent. When the dealer is accepted by respondent as a customer, he is sent a form letter in which this paragraph occurs: 'Our list price insures a fair profit only, and the protection of that profit is vital to us both. *We will be glad to have your co-operation in advising us of any sale of our products, that comes to your notice, that is detrimental to our mutual interests.*'

"Pursuant to its policy of resale price maintenance, respondent has requested its customers to report competing dealers who sell its rolls for less than the resale price, and its customers have so reported such dealers. Respondent has also received from its salesmen and agents reports concerning dealers who sell Q. R. S. rolls for less than the resale prices named by it. With such reports as a foundation, respondent has endeavored to secure from the dealers reported agreements and promises to maintain respondent's resale prices, giving such dealers to understand that, unless they did so, they could no longer buy its player rolls.

"Acting upon information as to price cutting received from customers, salesmen, or agents, it has sought and secured from such competing dealers agreements to restore, observe, and maintain the resale prices. At the demand of a customer, who was a competitor of other customers of respondent in the sale of rolls, respondent has brought pressure to bear upon such other customers to restore, observe, and maintain the resale prices, and such action has been taken as a condition upon which the demanding customer promised to continue to observe and maintain such resale prices, * * * and respondent has cut off or refused to sell such other customers, because such other customers had failed or refused to observe and maintain the resale prices.

"In carrying out its aforesaid policy of resale price maintenance, respondent has refused to sell to dealers who persisted in cutting the resale price fixed by respondent, and has refused to sell to dealers who would not promise to observe and maintain its resale price. The resale prices suggested by respondent are maintained by 99 per cent. of its dealers. * * * Respondent, in the course of its business has entered into agreements with dealers for the sale and distribution of its rolls, by which such dealers undertake to deal exclusively in player rolls made and sold by respondent, and not to buy, sell, or deal in player rolls made by any competitor of respondent, except such character, class, or kind of roll as is not made or sold by respondent and cannot be secured from it.

"During the space of about a year, running from March 29, 1920, to July 21, 1921, respondent entered into such exclusive dealing agreements with numerous dealers scattered through various states of the United States, and business in Q. R. S. player rolls was carried on between respondent and such dealers pursuant to such agreements. * * * This method of initiating exclusive dealing agreements was adopted to cover up the fact that such agreements were solicited by respondent, and to give the impression that they were made in response to spontaneous offers from customers.

"The consideration flowing from respondent to such dealers for exclusive dealing in Q. R. S. player rolls in most instances included a so-called unlimited exchange privilege, by which respondent agreed to credit against future orders from the dealers the amount paid by such dealer for Q. R. S. player rolls which the dealer was unable to sell * * * within the previous four months. Such unlimited exchanges as were granted its exclusive dealers by respondent were equivalent to a rebate upon the purchase price paid for said goods by said dealers to respondent. * * *

"Such agreements for exclusive dealing have had the effect of causing dealers to discontinue the handling of player rolls manufactured and sold by competitors of respondent, and to prevent such dealers from selling or distributing player rolls made by manufacturers who were competing with respondent. * * * The agreements for exclusive dealings have applied at various times to some 475 dealers in the several states, who were and are in general the largest dealers in the several states, and have supplemented the policy of respondent in maintaining its resale price for Q. R. S. music rolls, and in fact have been and are a factor aiding in such resale price maintenance. * * *

"Conclusion. The practices of respondent, as set forth in the foregoing findings, are, in the circumstances therein set forth, unfair methods of competition in interstate commerce, in violation of section 5 of the provisions of the Federal Trade Commission Act [Comp. St. § 8836e], and * * * are in violation of section 3 of the act of Congress entitled 'An act to supplement existing laws against unlawful restraints and monopolies, and for other purposes'" [Comp. St. § 8835c].

While these findings are attacked as prejudicial, incomplete, and in some instances unsupported by any evidence, we are persuaded that they should be accepted as the basis of action on the part of this court. Federal Trade Commission v. Curtis Pub. Co., 260 U. S. 583, 43 S. Ct. 210, 67 L. Ed. 408. Omission has been purposely made of certain findings, more properly called conclusions.

[1] Upon this statement of the facts the only question for serious consideration is the form of the order we should enter; for, while respondent must be accorded the unqualified right to choose its customers (United States v. Colgate & Co., 250 U. S. 300, 39 S. Ct. 465, 63 L. Ed. 992, 7 A. L. R. 443; Frey & Son v. Cudahy Packing Co., 256 U. S. 208, 41 S. Ct. 451, 65 L. Ed. 892), it cannot lawfully by agreement fix and enforce the price at which the retailers shall sell its rolls (Federal Trade Commission v. Beech Nut Packing Co., 257 U. S. 441, 42 S. Ct. 150, 66 L. Ed. 307, 19 A. L. R. 882; Dr. Miles Medical Co. v. Park & Sons, 220 U. S. 373, 31 S. Ct. 376, 55 L. Ed. 502; Boston Store v. American Graphophone Co., 246 U. S. 8, 38 S. Ct. 257, 62 L. Ed. 551, Ann.

Cas. 1918C, 447; United States v. Schrader, 252 U. S. 85, 40 S. Ct. 251, 64 L. Ed. 471; Frey v. Cudahy, supra; Moir v. Commission [C. C. A.] 12 F.[2d] 22; Toledo Pipe-Threading Machine Co. v. Federal Trade Commission [C. C. A.] 11 F.[2d] 337). Nor can respondent accomplish the same result by means that do not rise to the dignity of an express agreement, but are for all practical purposes its equivalent.

[2] In the present case the methods adopted were not unlike those condemned in the Beech Nut Case. That respondent succeeded in destroying competition among the retailers is the finding of the Commission, supported, as we believe, by the evidence. And this is what it cannot, under either the Anti-Trust Act or the Federal Trade Commission Act, lawfully do.

Respondent argues that its business is peculiar and necessarily founded on "an exchange of rolls" policy. We are not unmindful of the necessity of viewing each industry separately and in the light of its own peculiar problems. The exchange of rolls in and of itself may not be injurious. In fact, it appears to be a necessary and useful practice in furthering the music roll business; but the order does not condemn it, except as it is used as an unlawful means to accomplish a prohibited policy. That condemned policy is the fixing and maintenance of resale prices on the part of retailers. Likewise, to ascertain from one retailer information about another competitor (both being respondent's customers) is objectionable only when such information and such policy is used as a club to force all retailers to maintain a uniform price.

Petitioner's petition is denied. The application of respondent for an enforcement order is granted. The clerk will enter an order identical with the one entered by the commission.