## J. W. KOBI CO. v. FEDERAL TRADE COMMISSION.

Circuit Court of Appeals, Second Circuit.
December 12, 1927.

No. 40.

1. Trade-marks and trade-names and unfair competition ⬤⟶80½—Combination of conspiracy to maintain resale prices may be implied from course of dealing or other circumstances (Clayton Act [38 Stat. 730]).

Essential agreement or combination or conspiracy to maintain resale prices of products, constituting a violation of the Clayton Act (38 Stat. 730), may be implied from a course of dealing or other circumstances.

2. Monopolies ⬤⟶17(1)—Plan to maintain resale prices and elminate price cutters comes within prohibition of "unfair method of competition" (Federal Trade Commission Act [15 USCA §§ 41–51]).

Plan to maintain resale prices and eliminate price cutters, indicating a dangerous tendency unduly to hinder competition and to create a monopoly, comes within the prohibition of an "unfair method of competition" in commerce, forbidden by Federal Trade Commission Act (15 USCA §§ 41–51).

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Unfair Competition.]

3. Monopolies ⬤⟶17(2)—Agreements for maintaining resale prices, together with method of securing reports on price cutters, held to warrant cease and desist order of Federal Trade Commission (Clayton Act [38 Stat. 730]).

Agreements with customers, either directly or indirectly, assuring resale prices would be observed, together with method for securing reports on price cutters, with threat to refuse sales to dealers so reported, held offensive to the Clayton Act (38 Stat. 730), and to warrant order of Federal Trade Commission to cease and desist from carrying or attempting to carry into effect such policy.

4. Trade-marks and trade-names and unfair competition ⬤⟶80½—Commissioner, taking evidence and making report without recommendation, was not disqualified from participating in decision rendered by commission (Federal Trade Commission Act, §§ 3, 9 [15 USCA §§ 43, 49]).

The fact that commissioner, under Federal Trade Commission Act, §§ 3, 9 (15 USCA §§ 43, 49), took evidence and made a report without recommendation, does not disqualify him from participating in decision rendered by the commission.

5. Trade-marks and trade-names and unfair competition ⬤⟶80½—Federal Trade Commission exercises only administrative function (Federal Trade Commission Act [15 USCA §§ 41–51]).

Federal Trade Commission exercises only the administrative function delegated by Federal Trade Commission Act (15 USCA §§ 41–51), and has no judicial powers.

6. Trade-marks and trade-names and unfair competition ⬤⟶80½—Cease and desist order of Federal Trade Commission held not too indefinite for purposes of obedience to its command.

Order of Federal Trade Commission, directing seller to cease and desist from carrying into effect or attempting to carry into effect its policy of securing maintenance of resale prices for its products by co-operative methods, held not too indefinite for purposes of obedience to its command.

Petition to Review Order of Federal Trade Commission.

Original application by J. W. Kobi Company to review an order of the Federal Trade Commission. Petition denied.

Joseph A. Burdeau, of New York City (Daniel N. Dougherty, of San Francisco, Cal., George F. Scull, of New York City, and Chadwick, McMicken, Ramsey & Rupp, of Seattle, Wash., of counsel), for petitioner.

Bayard T. Hainer, Chief Counsel, Adrien F. Busick, Asst. Chief Counsel, and James T. Clark, all of Washington, D. C., for respondent.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

MANTON, Circuit Judge. The order entered by the Federal Trade Commission directs the petitioner to cease and desist from carrying into effect or attempting to carry into effect its policy of securing the maintenance of resale prices for its products by co-operative methods, in which it and its distributors, customers, and agents undertook to prevent sales of its products for less than such prices by (a) seeking or securing or entering into contracts, agreements, or understandings with customers or prospective customers that they' will maintain the resale prices designated by it; (b) by soliciting customers to report the names of other customers who failed to observe such resale prices; and (c) by utilizing any equivalent co-operative means of accomplishing the maintenance of such resale prices. The order rests on agreements or understandings and co-operative methods of price fixing. The agreement, or understanding, or co-operative methods might be implied from the course of dealing or other circumstances. Federal Trade Commission v. Beech-Nut Packing Co., 257 U. S. 441, 42 S. Ct. 150, 66 L. Ed. 307, 19 A. L. R. 882; Frey & Son v. Cudahy Packing Co., 256 U. S. 208, 41 S. Ct. 451, 65 L. Ed. 892.

[1] This record consists of correspondence of the petitioner with its customers relating to resale price fixing. No customers were called

as witnesses, but the petitioner's officers were called, and admitted that in some instances they had inquired from the trade as to price cutting by competitors, and stated that it was their policy not to sell to price cutters when so informed. They also admitted that in some specific instances they had entered into agreements with customers to observe resale prices, and that, when price cutting had been called to their attention, they asked customers to call further instances of price cutting of the kind to their attention. The correspondence between the petitioner and its customers and others brings this case well within the rule that the essential agreement or combination or conspiracy which is a violation of the Clayton Act (38 Stat. 730) might be implied from a course of dealing or other circumstances. United States v. Schrader's Sons, Inc., 252 U. S. 85, 40 S. Ct. 251, 64 L. Ed. 471; Federal Trade Com. v. Beech-Nut Packing Co., supra. The petitioner undoubtedly was endeavoring to control its resale prices, so as to prevent reduced prices. That was its definite purpose. It represented that it did not sell to price cutters, and before it accepted customers it made it plain that its resale prices would have to be observed. In some instances it obtained a tacit agreement to maintain resale prices, and in others it received a promise so to do, and thereupon served the customer his requirements. There are many instances in which it wrote to price-cutting customers a letter of which the one to George Kay is a sample, wherein it said:

"In the few instances where it has been necessary to urge the price maintenance proposition with other customers, we have received voluntary assurance that our prices would not be cut by the distributor unless we were first notified. This arrangement seems very fair to us, and although we do not suggest that you take such action, we think possibly that you may wish to do so. We shall hope to hear from you again."

And another to the Royal Drug Company:

"We will greatly appreciate your immediate assurance that you agree with our contentions and that you will comply with our request not to list Golden Glint or Golden Glint shampoo at a lower quotation than $2 net."

And, receiving no reply, they again wrote:

"We are therefore returning your order and regret that we will be unable to fill it, until such time as you are prepared to furnish reliable assurance that you agree with our policies. A letter indorsing our suggestions and stating in detail what steps you have taken or are taking to carry them out will be carefully considered. Telegraphic advice of this kind will not be accepted."

Thereafter, when they received an order with assurances that the prices would be maintained, they replied:

"We have your letter of April 7 and thank you for the assurance that you will not cut the resale price of Golden Glint shampoo below $2."

This character of correspondence was repeated to a number of their customers, and warnings were delivered that, if the prices were not maintained, future sales would be withheld. Its insistence that its terms and conditions be met before it accepted customers, and its reference to other customers who were following its policy or requirements, was sufficient to justify the finding of the commission that there were agreements to maintain resale prices. There was sufficient to require the action of the Trade Commission which would forbid the continuance and extension of these practices, which constituted a method to make the petitioner's policy of fixing resale prices that of its customers.

Another objectionable practice consisted of obtaining reports of price cutters from competitors. A letter written by petitioner's sales manager to its president makes reference to a complaint (a) from wholesalers against retail druggists' associations; (b) from hair goods jobbers against each other; and (c) from Brown against anybody and everybody who trespassed on his territory. And in a letter dated January 11, 1923, addressed to one of its customers, it wrote:

"Our salesmen are reporting all deviations from the suggested resale price schedule that come to their attention. A number of jobbers have consented to co-operate in the same way. We would like very much to have your assurance that you will support us in our effort to do the fair thing by everybody. How about it?"

And to another customer they wrote on May 15, 1923:

"We note that you previously cut the prices in order to meet competition. In case a similar necessity should arise again, we will be very appreciative if you will send us the name of your price-cutting competitor. We feel that we can safely guarantee you against this sort of competition and will appreciate your co-operation as requested."

[2] Letters of like character, showing a well-settled and determined plan to maintain resale prices and eliminate price cutters, is found in this extensive correspondence offered in evidence. It indicates clearly a dangerous tendency unduly to hinder competition, and to attempt to create a monopoly in its products, and it is a practice which it was the desire of the Clayton Act to pre-

vent. Federal Trade Comm. v. Gratz, 253 U. S. 421, 40 S. Ct. 572, 64 L. Ed. 993. It comes well within the prohibition of an unfair method of competition in commerce which is declared unlawful. 38 Stat. 717 (15 USCA §§ 41–51). The basis of the condemnation of resale price fixing is the elimination of competition as represented by the prices among distributors of a product on which the resale prices were so fixed, and it has the danger of a distinct monopolistic effect. Toledo Pipe Threading Machine Co. v. Fed. Trade Comm. (C. C. A.) 11 F.(2d) 337; Fox Film Corp. v. Fed. Trade Comm. (C. C. A.) 296 F. 353.

But it is argued that the decision in Harriet Hubbard Ayer, Inc., v. Fed. Trade Comm. (C. C. A.) 15 F.(2d) 274, justifies the petitioner in its business conduct. There we pointed out that there was no evidence to show that there was anything by way of direction in their merchandising system to compel or even request retail dealers to adhere to their prices in resale. A price list was sent out in the packages, and to serve no purposes other than to apprise the ultimate consumer of the ordinary retail prices at which he could purchase petitioner's products, and also to name the price at which the retailer or jobber could purchase its product. We pointed out that there were but a few isolated instances of an effort to eliminate a price cutter, and said:

"We think the petitioner did no more than it might lawfully do in selecting its customer whom it considered desirable."

And further we said:

"There is nothing disclosed in this record to base a finding of fact that there was an effort of discrimination resulting in substantially lessening competition or tending to create a monopoly in this line of commerce. Price maintenance is unlawful when it tends to create a monopoly. But there was no cooperation with its jobbers and retailers, or other distributors, which was effectual either as an agreement, expressed or implied, intended to accomplish purposes of price fixing. Until such is established, an order to cease and desist is unwarranted."

[3] For the reasons there stated, we think the cases are distinguishable. What was proven here established offenses of agreements or understanding either in obtaining, directly or indirectly from its customers, promises or assurances that the prices fixed by the petitioner would be observed by such dealers and entering into contracts with the understanding that the petitioner's products would be resold by the dealers at prices specified or fixed by the petitioner. There was also a method employed in reporting on price cutters and a continuous request of dealers and jobbers to report the competitors who did not observe the resale prices suggested by the petitioner and a threat to refuse sales to dealers so reported on. These practices were offensive to the act and warrant the order entered below. Cream of Wheat Co. v. Fed. Trade Comm. (C. C. A.) 14 F.(2d) 40; Q. R. S. Music Co. v. Fed. Trade Comm. (C. C. A.) 12 F.(2d) 730; Moir et al. v. Fed. Trade Comm. (C. C. A.) 12 F.(2d) 22; Hills Bros. v. Fed. Trade Comm. (C. C. A.) 9 F.(2d) 481.

[4] It is argued that the order cannot stand because one commissioner took the testimony in the case to support the complaint and afterwards passed on the effect of it as a member of the commission; that he was not present at the oral argument when the case was submitted. It is conceded that briefs were filed. The claim that the statute makes the commissioner both the judge and prosecutor has been held to be unsubstantial. Sears, Roebuck & Co. v. Fed. Trade Comm. (C. C. A.) 258 F. 307, 6 A. L. R. 358. The statute provides (section 3, Fed. Trade Commission Act [15 USCA § 43]) that the commission may, by one or more of its members or by such examiners as it may designate, prosecute any inquiry necessary to its duties in any part of the United States. Section 9 of the Federal Trade Commission Act (15 USCA § 49) authorizes a member of the commission to sign subpœnas, administer oaths, affirmations, summon witnesses and receive evidence. The fact that the commissioner took the evidence and made a report without recommendation does not, under the terms of the act, disqualify him from participating in the decision rendered by the commission.

[5, 6] It is argued that the order of the commission should be supplemented by directing affirmatively what the petitioner may do. But the commission exercises only the administrative function delegated by the act. It has no judicial powers. Nat. Harness Mfrs.' Ass'n v. Fed. Trade Comm. (C. C. A.) 268 F. 705. It has not had delegated to it the power of review. The order of the commission is not too indefinite for purposes of obedience to its command. Oppenheim, Oberndorf & Co. v. Fed. Trade Comm. (C. C. A.) 5 F.(2d) 574; Fed. Trade Comm. v. Beech-Nut Packing Co., 257 U. S. 441, 42 S. Ct. 150, 66 L. Ed. 307, 19 A. L. R. 882.

The petition is denied.