EX PARTE MONSERRATE IRIZARRY MARRERO, Petitioner.

No. 441. Argued November 18, 1946.—Decided November 21, 1946.

*Oscar Souffront, Enrique Alcaraz Casablanca,* and *Enrique Báez García* for petitioner. *Luis Negrón Fernández, Acting Attorney General,* for The People. *Córdova & González,* for Federación del Comercio de Puerto Rico, as *amicus curiae.*

MR. JUSTICE TODD, JR., delivered the opinion of the court.

We issued the writ of habeas corpus in this case to determine whether, as alleged by Monserrate Irizarry Marrero, petitioner herein, his imprisonment is illegal [1] because the offense charged against him and for which he was sentenced to serve three months in jail and pay a fine of $15 is not punishable under the law.

The information filed by the District Attorney of the District Court of Mayagüez, in its pertinent part, reads as follows: ". . . the aforesaid defendant who is and was a retailer, with his commercial establishment open to the public in Vileya Street, ward of Mineral, in the city of Mayagüez, P. R., did unlafully, willfully, and maliciously and aware that he was violating Act No. 228 enacted by the Legislature of Puerto Rico on May 12, 1942, amended by Act No. 493 enacted by the Legislature of Puerto Rico on April 29, 1946, relating to Administrative Order No. 8 promulgated by the General Supplies Administrator on September 8, 1942, (as amended and enlarged) pursuant to Act No. 228 enacted by the Legislature of Puerto Rico on May 12, 1942, amended by Act No.

---

[1] Section 1 of the Habeas Corpus Act (§ 469 of the Code of Criminal Procedure) provides that: "Every person unlawfully imprisoned or restrained of his liberty, under any pretense whatever, may prosecute a writ of habeas corpus, to inquire into the cause of such imprisonment or restraint." And § 5 of the Penal Code provides that: "No person shall be arrested for any crime or offense unless such crime or offense is expressly declared in this Code, except for crimes and offenses against the laws of the United States applicable to Puerto Rico and the enactments of the Legislative Assembly of Puerto Rico and laws enacted by the Congress of the United States for Puerto Rico."

493 enacted by the Legislature of Puerto Rico on April 29, 1946, and which Order has the force of law because it was promulgated and published under the law in the newspaper "EL MUNDO" on September 8, 1942 and on July 1, 1946, refuse to sell to Américo Romero Castillo one quart pound of lard notwithstanding the fact that the defendant had sufficient stock of said product and the price offered for said amount was the legal market price."

Act No. 228 of 1942[2] creating the General Supplies Administration (Laws of 1942, p. 1268), as amended by Act No. 493 of 1946 (Laws of 1946, p. 1474), provides in its § 10(*b*) in part as follows:

". . . *Nothing in this Act shall be construed to require any person to sell any staple commodity;* Provided, however, That in those cases in which any merchant or dealer has stocks of staple commodities and refuses to sell them to the public because he does not wish to comply with the price schedules or any other provision of this Act (cornering), the Administrator may make use, with reference to such stocks, *of the power of taking conferred upon him by this Act."* (Italics ours.)

[2] The purpose of this Act is set forth in its title which in its pertinent part reads thus:

"To create a General Supplies Administration Office, and the office of General Supplies Administrators; to fix his faculties, duties and compensation; to promote collective security by means of the stabilization of prices; to check inflation, excessive price rises, economic dislocations, and speculative practices; to cheapen as much as possible the cost of staple products to the inhabitants of Puerto Rico; to provide for the purchase, storage, transportation and disposition of adequate stocks of staple commodities; to determine to which persons and in what quantities staple commodities shall be sold; to prohibit violations of the rules, orders, or price schedules promulgated under this Act; to punish violations of the rules, orders, or price schedules prescribed under this Act; to prohibit and prevent the practice of cornering staple commodities for the purpose of evading the law; to authorize the General Supplies Administrator to grant loans and to establish production and consumption cooperatives of staple commodities, establish a planting plan of said commodities, and to create and administer establishments for the sale at wholesale and retail of staple commodities; to establish the procedure for the reconsideration of the rules, orders, and price schedules fixed by the Administrator; to create the Court of Appeals of supplies, and fix its jurisdiction and determine its powers; to provide means for complying with this Act; to establish a systems of licenses; . . ."

Section 2(c) thereof authorizes the General Supplies Administrator ". . . from time to time, issue such regulations and orders as he may deem necessary to enforce the provisions of tihs Act," and § 3(c) provides that "Whenever in the judgment of the Administrator such action should be necessary and proper in order to effectuate the purposes of this Act, he may regulate by regulation or order, and he may prohibit, such speculative or manipulative practices, including practices relating to changes in the form or quality of a commodity, or to the hoarding of any staple commodity, as in his judgment are equivalent or lead to price increases inconsistent with the purposes of this Act," and subdivision (e) of this same Section provides that: "The orders, rules and regulations prescribed hereunder may contain all such provisions as the Administrator may deem necessary in order to prevent the evasion thereof."

Acting under the power granted him by law, the General Supplies Administrator approved on August 3, 1946, Administrative Order No. 88 amending Order No. 8 of September 8, 1942, which provides as follows:

"Administrative order No. 8 of September 8, 1942, the fifth provision of which prohibits 'To refuse to sell a commodity which he has in stock,' shall be understood to be amended as follows:

" 'It is hereby prohibited to refuse to sell a commodity in stock, *Provided,* That when the commodity is rationed, the retailer shall carry out its distribution according to the list of his clients or to the official rationing in force at that time, *Provided further,* That when in the opinion of a retailer, a consumer is purchasing for hoarding purposes, he may then refuse to sell, but he should notify immediately the Local Board of the General Supplies Administration or any agent of the Administrator.' "

The Administrator had already provided in Order No. 8, *supra,* that the violation of any of its provisions would be punished for each offense by a fine of not less than five thousand dollars and by imprisonment of not less than three months or more than two years.

638

It is the violation of this order which is charged in the information filed against petitioner herein as constituting a violation of Act No. 228.

 It is an elementary rule of law that when the legislature delegates to a board or person powers to promulgate rules, the latter, to be valid, cannot be in conflict with the norms established in the law. *People* v. *Bou,* 64 P.R.R. 445; *Alemañy* v. *Industrial Commission,* 64 P.R.R. 845, and cases cited therein; *Villa* v. *Industrial Commission,* 65 P.R.R. 527. The purpose in delegating the power of promulgating rules was no other than to carry out the execution of the law, but this power may never be exercised in such a manner as to cause the intention of the legislator to be substituted by that of the board or person authorized to make the regulations. And still less may any board or person, by virtue of such power, create an offense which the legislature itself did not establish.

Section 10(*b*) of Act No. 228, *supra,* is so clear in its terms that no other construction may be inferred except what is meant by the very words used in ordinary language. . When the legislator stated "Nothing in this Act shall be construed to require any person to sell any staple commodity" it meant to say exactly what it had to say in order to render the law valid. Constitutionally,[3] the Législature could not require any person to engage in business. It could authorize, however, the General Supplies Administrator to regulate the trade in staple commodities in a reasonable way, according to the emergency which then prevailed and still prevails, and that was its intention upon conferring on the General Supplies Administrator the power of taking the staple commodities that any merchant might refuse to sell to the public. However, in the case at bar, the General Supplies Administrator went

---

[3] Subdivision (*d*) of § 4 of the Federal Emergency Price Control Act of 1942 from which the provisions of Act No. 228, *supra,* are almost textually copied, provides, similar to ours, that "Nothing in this Act shall be construed to require any person to sell any commodity or to offer any accomodations for rent."

further and, without any authority, created an offense based on facts which the Legislature did not authorize, since it expressly and clearly provided that the Act should not be construed in the sense of requiring any person to sell staple commodities.

The Acting Attorney General, before consenting to the petition in this case, and in order to appraise us of the legal views held by the lower court in regard to the matter involved, submitted to this court a certified copy of the proceedings had in the lower court before the rendition of the judgment in *People* v. *Francisco Durán* and *José Durán*, wherein the defendants were charged with the same offense as in the present case. At the request of the Acting Attorney General, the prosecuting attorney of the District Court of Mayagüez moved for the dismissal of said case [4] on the ground that, under § 10(b) of Act No. 228 of 1942, supra, no merchant was required to sell staple commodities to anyone.

The lower court held that § 10(b) of the Act is not applicable to merchants of staple commodities to whom the General Supplies Administrator had granted a license, pursuant to § 13(c) of the Act, to engage in the sale of said articles, but that, on the contrary, it merely applied to those merchants who had not obtained the license. This construction of § 13(c) of the Act is erroneous, inasmuch as what it provides, in connection to the question involved herein, is that the Administration may "require all persons subject to any regulation or order or price-schedule issued under this Act to ob-

---

[4] This action of the Acting Attorney General was authorized by law, inasmuch as district attorneys are but agents of the Attorney General and, although according to § 64 of the Political Code, criminal proceedings shall be prosecuted by the district attorney of the corresponding court, without special authority of the Attorney General, yet "in all such cases the attorney general may intervene in the public interest." And if the Attorney General is convinced that a certain alleged violation does not constitute an offense, he not only may, but should inform it to the court, the latter not being required, of course, to accept his opinion; but neither is it authorized to characterize as "officious" the action of the Attorney General in directing the district attorney to move for the dismissal of a case on said ground.

tain a license which shall be issued by the Administrator himself, as an indispensable prior requirement, for such person to engage in the sale of, or in any phase of a business in connection with, any staple commodity . . ." After excluding from this requirement all farmers who are producers engaged in the sale of their own agricultural products, it provides that "No natural or artificial person may engaged in the said businesses without first obtaining the said license, . . ." and an additional fine is provided for any violation of this provision. The rest of the subdivision refers to the reasons for suspending licenses, which are "(1) Violation of any price-schedule; (2) violation of the orders of the Administrator made pursuant to his lawful prerrogatives; and (3) violation of any provision of this Act which entails a penal sanction." Then it describes the proceeding to be followed before the district court in order to obtain said suspension and provides that the order of the court to suspend the license shall be unappealable but if the court refuses such suspension the Administrator may take an appeal to the Supreme Court. The subdivision ends by providing "that the Administrator may exercise over the stocks of staple commodities, property of the person subject to the order of suspension, the power of taking vested in him by this Act."

As may be seen, the legislator made clear his intention that the Administrator *could* require the obtention of a license from every person subject to any regulation or order or price-schedule as an indispensable, prior requirement, for said person to engage in the *sale of* or in any phase of business in connection with any staple commodity, but further on it provided that no natural or artificial person could engage in the said business "without first obtaining the said license." In other words, in order to sell staple commodities it is an indispensable requirement. to obtain the license issued by the Administrator. This is admitted by the lower court in its order when it says that the General Supplies Administrator, under Order No. 82, "considered as having license to trade in

staple commodities *every merchant established in said commodities.*" (Italics ours.) Nevertheless, said court found that: "There are two kinds of traders, those who obtain a license to sell staple commodities, and *those who have no license to sell staple commodities.*" (Italics ours.) The contradiction is obvious and it was on this ground that the lower court held that those merchants *"who have no license"* fall under the provision of § 10(*b*) of the Act. That is, that only those merchants "who have no license" may refuse to sell staple commodities and their stock may be taken by the Administrator, but those merchants who obtained a license may not refuse to sell and, if they do so, may be prosecuted.

We can not accept this construction, first, because the Act does not provide any such thing and by giving it that construction the same would be void; and, second, because if it contained any such provision it would likewise be void for, as we stated before, constitutionally no person, natural or artificial, may be required to engage in the sale of staple commodities or in any other business, although the manner and the prices at which he is to sell said staple commodities during the emergency period may be regulated.

As was properly stated by the attorney for the Federación del Comercio de Puerto Rico at the hearing of this case, the provisions of § 10(*b*) of our Act, although similar to the provisions of § 4(*b*) of the Federal Act, are independent of the requirement of a license contained in both Acts. And this is shown by the fact that § 4(*d*) of the Federal Act not only provides that no person shall be required to sell any article, but that since said Act was made to include rentals for dwelling, it also provides that it shall not be construed "to require any person to offer any accommodations for rent." Since in order to be engaged in the renting for housing accommodations no license whatsoever is required, it is obvious that the provisions referring to a license are independent and have nothing to do with the provisions of § 10 (*b*) or of § 4 (*d*), *supra*.

The lower court further held that § 10(*b*) should be construed and applied in harmony with §§ 3(*f*), 9(*f*), 10(*a*), and 12(*c*) of the Act. Let us see.

Section 3(*f*) merely authorizes the Administrator to . . . "prohibit by rule or order the transportation, receipt, storage, or sale in Puerto Rico of articles *not* staple commodities or . . . determine . . . the quantities of *said* articles which during any period of time may be transported, received, stored or sold and shall establish a system of permits for . . . *said* articles."

We do not see that this provision is material or applicable to the question under discussion, inasmuch as it merely refers to articles *not* staple commodities and, even as to them, the Administrator is not authorized to require anyone to sell them.

As to § 9(*f*), we do not find that said Section contains any subdivision (*f*).

Section 3(*a*) refers to the power granted the Administrator to fix maximum prices or maximum profits and to establish scales of minimum prices and of minimum benefits as to staple commodities, and it prescribes the procedure to be followed in order to carry it out. We do not see, either, in this subdivision any relevancy to the question under discussion, and much less in § 12(*c*), which refers exclusively to the creation of the Supplies Appeal Court mentioned in subdivisions (*a*) and (*b*) of the same Section.[5]

We have examined and analyzed all the grounds set forth by the lower court in support of its theory that the refusal of a merchant to sell staple commodities constitutes a public offense. Not one of the grounds is warranted by law. In the construction and application of § 4(*d*) of the Federal Act, equivalent to § 10(*b*) of our Act, we have been unable

---

[5] As we have seen, in order to obtain the suspension of a license issued by the Administrator the latter must appeal to this court and none of the reasons enumerated in said Section for obtaining said suspension includes that of refusing to sell staple commodities.

to find any case which holds that the refusal to sell staple commodities constitutes an offense. Such a case could hardly exist, in view of the legislative intent so clearly and conclusively set forth. On the other hand, in *Buckeye Parking Corporation* v. *Bowles*, 141 F. (2d) 692, the plaintiff corporation which was engaged in the renting of parking lots, presented to the Administrator a change in the hourly rates which it charged for said service. The same was rejected, and it alleged before the United States Emergency Court of Appeals that said rejection was tantamount to requiring the plaintiff to sell one-hour service and that it constituted a violation of § 4(d) of the Act. The court said: "The answer to this contention obviously is that the Administrator is not interfering with *complainant's right to discontinue the one hour service. It may discontinue the service if it desires,* but may not inaugurate a program which will have the effect of increasing its minimum charge." (Italics ours.)

The Supreme Court of the United States has consistently held, in construing the scope of the Sherman Anti Trust Act and of the Federal Trade Commission Act declaring illegal unfair methods of commercial competition (interstate commerce), that, as stated in *U. S.* v. *Colgate & Co.*, 250 U. S. 300, 307, "the act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal. And, of course, he may announce in advance the circumstances under which he will refuse to sell," which doctrine is restricted in *U. S.* v. *Schrader's Son, Inc.*, 252 U. S. 85, and *Federal Trade Comm.* v. *Beech Nut Co.*, 257 U. S. 441, 453, to the effect that, although a trader is not guilty of violating the Sherman Act because he refuses to sell to others and that he may ground his refusal on the fact that the latter would not sell at the prices which he fixed for the resale, "he may not, consistently with the act, go beyond the exercise of this right and by contracts or

combinations, express or implied, unduly hinder or obstruct the free and natural flow of commerce in the channels of interstate trade." This doctrine was recently ratified in *U. S.* v. *Baush & Lomb Co.*, 321 U. S. 707. Although these cases were not decided under the Federal Emergency Price Control Act and did not involve the fixing of maximum prices by a Government agency, the principle or doctrine established as to the right of a person, either natural or artificial, to engage in a particular business, is the same.

In *Ex parte Rivera*, 34 P.R.R. 741, we granted a petition of habeas corpus and decided that, pursuant to § 95 of the Act defining public service companies, as amended in 1921, a violation of a provision of the regulations approved by the Public Service Commission not defined as an offense was not punishable, and we stated, at p. 743: "Imprisonment is a punishment imposed in consequence of a crime and it is elementary in penal matters that no act can be charged and punished unless it is expressly defined and made punishable by law. Section 5 of the Penal Code."

It has been further held that when a person is imprisoned for the doing of certain acts which do not constitute an offense under the law the court lacks jurisdiction over such a prosecution and the defendant may be discharged in a habeas corpus proceeding even after trial and judgment. 25 Am. Jur., Habeas Corpus, § 42.

For the reasons stated we hold that the District Court of Mayagüez acted without jurisdiction in the case of *People of Puerto Rico* v. *Monserrate Irizarry Marrero* for an alleged violation of Act No. 228 of 1942, inasmuch as the facts charged in the information do not constitute any public offense.

The petition is granted and the petitioner discharged.

Mr. Justice Snyder, being temporarily absent in the continental United States, was not acquainted with the terms of the opinion, but before his departure he stated that he concurred in the result.