## CREAM OF WHEAT CO. v. FEDERAL TRADE COMMISSION.

(Circuit Court of Appeals, Eighth Circuit. July 26, 1926.)

No. 284.

1. **Trade-marks and trade-names and unfair competition** ☞80½, New, vol. 8A Key-No. Series.

Federal Trade Commission findings on conflicting evidence being conclusive, under section 5 of Act Sept. 26, 1914, creating Commission, only question before court is whether order of Commission on findings was authorized by statute (Comp. St. § 8836e).

2. **Trade-marks and trade-names and unfair competition** ☞80½, New, vol. 8A Key-No. Series.

Findings of Federal Trade Commission as to price maintenance methods held to show respondent in proceeding before Commission guilty of unfair methods of competition, in violation of Act Sept. 26, 1914, to create commission (Comp. St. §§ 8836a–8836k).

3. **Trade-marks and trade-names and unfair competition** ☞80½, New, vol. 8A Key-No. Series—Order of Trade Commission, requiring manufacturer to desist from "soliciting and securing" from customers information and reports concerning price maintenance, held not in excess of Commission's authority.

Order of Federal Trade Commission, requiring manufacturer to desist from "soliciting and securing" from customers themselves information as to whether such customers had maintained suggested retail prices, and from "soliciting and securing" reports from customers and verifying such reports by others from other customers, held not in excess of Commission's authority.

4. **Trade-marks and trade-names and unfair competition** ☞80½, New, vol. 8A Key-No. Series—Order of Commission prohibiting employment of sales agents "to assist" in price maintenance plan by reporting dealers held not in excess of Commission's authority.

Order of Federal Trade Commission requiring manufacturer to desist from employing sales agents "to assist" in price maintenance plan by reporting price cutting dealers, when construed with other paragraphs of order, held to only prohibit agents from soliciting customers to furnish them information, and not in excess of Commission's authority.

5. **Corporations** ☞397.

Acts of corporation's agents, within their authorized employment, are acts of corporation.

6. **Trade-marks and trade-names and unfair competition** ☞80½, New, vol. 8A Key-No. Series.

Order of Federal Trade Commission, requiring manufacturer to desist from utilizing "any other equivalent co-operative means of accomplishing the maintenance of prices fixed by" it, held too indefinite, and such as should be modified by provision enumerating means not prohibited.

Petition for Review of Order of Federal Trade Commission.

Petition by the Cream of Wheat Company for review of order of Federal Trade Commission requiring it to desist from carrying into effect its price maintenance policy by co-operative methods. Order of Commission amended, and, as amended, affirmed.

George W. Morgan, of St. Paul, Minn. (Rome G. Brown, of Minneapolis, Minn., Davis, Severance & Morgan, of St. Paul, Minn., and Brown & Guesmer, of Minneapolis, Minn., on the brief), for petitioner.

James T. Clark, of Washington, D. C. (Bayard T. Hainer and Adrien F. Busick, both of Washington, D. C., on the brief), for respondent.

Before LEWIS, Circuit Judge, and TRIEBER and KENNAMER, District Judges.

TRIEBER, District Judge. [1] The evidence before the Federal Trade Commission was quite voluminous and conflicting. Section 5 of the act creating the Commission (38 Stat. 719 [Comp. St. § 8836e]) made the findings of the Commission on conflicting evidence conclusive. There being substantial evidence to warrant the findings made, we are only concerned with the question whether the order of the Commission on the findings is authorized by the statute.

The findings of facts, so far as material to the issues, are:

"(4) Respondent employs no traveling salesmen. Respondent has, at certain localities in the United States, soliciting sales agents, through whom it receives orders for Cream of Wheat, which orders are taken subject to acceptance by respondent, and, if accepted, are filled by respondent, or under its direction, either from its stock of Cream of Wheat in Minneapolis, or from the stock in one of its warehouses.

"(5) The sales and distributing of Cream of Wheat by respondent, in its business as above described, extend to all the states of the United States and all territory within its jurisdiction, and to some extent to foreign countries. Respondent has sold, and now sells, principally to wholesalers or jobbers. The number of customers to whom it sells is approximately 4,500, which include nearly the entire number of wholesalers of cereal products and groceries in the United States. Cream of Wheat is sold at retail—that is, to the ultimate consumer—by nearly all retailers of groceries and cereal products in the United States, estimated by respondent to number over 300,000. The wholesalers or jobbers, to whom respondent sells, resell, in turn, to retailers within the radius of their respective trades. Sales and deliveries are made by respondent at a uniform delivered price to such purchasers f. o. b. cars at the place of purchaser's business.

"(6) Respondent has sold, and now sells, direct to certain large retailers, whose business enables them to buy in wholesale or carload lots, at the prices and upon the terms required by respondent from wholesalers. Among such retailers are certain so-called 'chain store organizations.' A 'chain store organization,' as here intended, is an individual, corporation, or partnership owning or operating a group of retail stores.

"(7) Respondent refuses to sell to 'collective purchasers,' or buying pools of independent stores, as distinguished from 'chain stores.' Respondent refuses to sell to any customer who buys for the purpose of reselling to other customers of the same class, e. g., wholesalers; and respondent refuses to sell to a purchaser in carload lots and at carload prices, who buys for the purpose of dividing such shipments with other customers, or for the purpose of having 'drop' shipments—that is, a part of a carload delivered at one point and another part of the same carload at another point. Respondent does not sell to mail order houses. These practices described in this paragraph have been in force for the past 20 years."

"(12) Cream of Wheat, as sold by respondent, has acquired with the public a wide and favorable reputation, and the consumption has steadily increased in this country and foreign countries. It is used, after cooking, by the individual consumer as breakfast food, and in other ways."

"(15) Respondent sells, it is roughly estimated, about 40 per cent. of the package cereal foods prepared from purified wheat middlings and sold in the United States by concerns who advertise nationally. Such firms which advertise nationally sell the great bulk of package cereal foods prepared from purified wheat middlings.

"(16) Sales and deliveries of Cream of Wheat are made by respondent at a uniform delivered price at any given time, or at a price which makes the cost of Cream of Wheat to all purchasers the same f. o. b. cars their places of business, no matter at what points within the United States the places of business of such purchasers may be located. From September, 1916, to May, 1919, however, respondent charged higher delivered prices for Cream of Wheat delivered at points in the Pacific Northwest than for that delivered at points east of the Rocky Mountains."

"(19) The term 'resale price,' as used in these findings, means the resale price named by respondent, and 'price cutting' and 'price cutter' mean, respectively, selling below and sellers below such resale prices."

"(21) Soon after its organization in 1897, respondent adopted and has since maintained a policy of fixing and enforcing minimum resale prices at which Cream of Wheat should be sold by its vendees, and, among the means adopted by it to that end, it has advised its agents and customers and prospective customers from time to time of its resale prices, and requested of its customers and prospective customers that they observe such resale prices in all their sales, declaring its purpose to refuse to accept or fill any further orders from those who should sell at prices below said minimum, or from those who supplied dealers who so cut its resale prices.

"Respondent has informed itself as to cutting of its resale prices through advertisements and lists of prices put out by customers, which have come to its attention, and has solicited and been furnished in response with reports or information of cutting of its resale prices by customers (a) from other customers; (b) from other dealers or associations of dealers; and (c) from respondent's sales agents. Where it learned by such means that customers were cutting its resale prices, or selling to others who were, it has been its policy to refuse further sales, where it deemed such action necessary to prevent further cutting of its resale prices. Respondent, prior to 1913, entered into agreements and contracts with customers, by which in terms they bound themselves to maintain its resale prices, and since it has at times sought and received from customers and prospective customers assurances of the observance of its resale prices amounting in substance to agreements or understandings to that end.

"(22) Under date of January 25, 1913, respondent issued to the trade a letter, stating its purpose to be 'to obviate any misunderstanding' as to its position 'with regard to the question of maintenance of prices on our product,' and to place before all its customers 'a statement of our position which shall control as to all future dealings.' It proceeds to 'notify all our customers' that it 'hereby withdraws and rescinds all orders, rules, directions, and requests, and (while denying the existence of any agreement, express or implied) we also withdraw and rescind, in so far as any such exist, all agreements, express or implied, actual or constructive, now or heretofore existing between this company and its customers with reference to the maintenance of prices by such customers,' and that sales of Cream of Wheat shall not be affected by previous communications on that subject. It states that in the future the respondent shall not sell to consumers, to retailers, or to chain or department stores, but exclusively to wholesalers; that it shall not require of them any agreement to 'maintain any price which we may establish, or observe any rules which we may see fit to make. We do, however, request that they shall maintain, in their sales to their retail customers, such prices as we deem to be to the best interest of the consumer and to our own business and to the general trade,' and that they would observe such rules as to sales as respondent may announce. Respondent warns that by this it does not intend to waive its right to refuse sales to any customer who fails to comply with any rules or request made by it, whose infringement it deems prejudicial to the interest named above, and that it will exercise such right so far as it may lawfully. It disclaims any purpose to create any restraint of trade or monopoly, but to protect the consumer from them from others."

"(24) Early in 1921, the National Chain Store Grocers' Association opened negotiations with the Cream of Wheat Company looking to sales of Cream of Wheat direct to its members, conducting retail stores. Paragraph 20 of the stipulation (Commission's Exhibit 1) covers the history of these negotiations, including correspondence. The letter of respondent's president to the association's secretary, dated February 28, 1921, in reviewing respondent's past dealings particularly with chain stores, contains references to 'personal' agreements, 'explicit understanding,' 'express understanding,' 'promises' by customers, past and existing, subsequent to 1913, to observe respondent's resale prices, on the keeping of which continuance of sales to them by respondent depends. In the letter of February 25, 1921, President Mapes makes the respondent's policy as outlined by him apply to wholesalers as well: 'In other words, we have continued to sell the American Stores Company and the National Grocery Company because they have kept their promises with regard to the resale price. We have refused to sell the Great Atlantic & Pacific Tea Company because they did not keep their promises. The same thing applies to wholesale grocers who are in no way connected with the retail trade, either directly or indirectly. We have not sold Reid, Murdock & Co. of Chicago a case of goods for five or six years, for the reason that they refused to comply with our wishes with regard to resale prices to their retail customers, and we are frequently obliged to refuse sales to exclusive wholesalers for the same reason.' Respondent's president states, in the same letter: 'There is no reason, as far as the writer can see, why we might not be willing to sell concerns such as, for example, are represented by the officers whom you show on your letterhead, if we could be assured that, notwithstanding the fact that, on account of their buying in carload quantities, they were not taking advantage of this to resell in their retail stores at a price lower than the ordinary retailer, not connected with any chain store proposition, can afford to sell. Unfortunately, however, as was evidenced particularly in the case of the Great Atlantic & Pacific Tea Company, we cannot always trust to their promises. They are by no manner of means the only sinners in this respect.'

"In his letter of March 26, 1921, President Mapes states that the only reason he saw why respondent might not sell to the chain stores was 'the question as to whether or not we could depend on these chain stores to maintain what we would consider an adequate retail price on our goods, which at present we would say would be 30 cents a package.' Distinguishing between chain stores constituting 'an organization owned and controlled by one company' having a large number of retail stores 'absolutely under their control,' and loose associations of retail stores to enable its members to buy at wholesale prices, President Mapes states: 'The second class I cannot see that it would be desirable for us to sell under any circumstances. The first class, such as you represent, we might be willing to place on our list of customers, always providing that we could be satisfied that they would absolutely maintain our retail price in all of their stores. The difficulty, however, with this would lie in the fact as to whether or no the National Chain Stores Grocers' Association could control their members. As you say, we are selling some of your members, and this is for the reason that, in as far as we know, they live up to their agreements. We do not sell, for example, the Great Atlantic & Pacific Tea Company, because they did not live up to their agreements, and we have no reason to suppose that their word is worth anything more now than it was several years ago.' He then states: 'Should we sell to members of your association, it would have to be on identically the same basis as we now sell to the wholesale grocery trade—namely, we do not exact any contract or make any agreements of any kind or nature whatsoever, with the wholesale grocer to whom we sell our goods, and after buying any quantity of our goods we do not question his right to resell it at any price which he may see fit. We do, however, suggest that, in the general interest of the trade, we consider it advisable that he should maintain a resale price,' etc., stating terms of sale, etc. He then states the policy of the company to refuse further sales to dealers who cut respondent's resale prices, also to advise other customers of such refusal and cut off any customer who thereafter sells to such resale price cutters. * * *

" 'In the event a wholesale customer does not see fit to comply with our request as to the price at which he shall resell Cream of Wheat to his retail trade, we exercise the right which we legally have, and refuse to sell him any further quantity of our product. In the case of your company, selling direct as it does to the consumer, were we to put you on our list of customers for the direct sale of Cream of Wheat, it would be with the request that you resell to your consumer trade at a price which at present would be not less than 30 cents per package.

" 'This would apply, without exception, to each and every one of your branch stores. If any of these branch stores, for any reason whatever, sold Cream of Wheat for less than our requested price, we would certainly refuse to sell that branch, and all the other stores of your company, any further quantity of Cream of Wheat. And, in the event we did so refuse to sell your company Cream of Wheat, we would undoubtedly so advise all the other companies in your association, as well as the wholesalers in your territory, and in advising them of our refusal to sell you, we would request them not to resell Cream of Wheat to you. In the event they did sell you Cream of Wheat, contrary to our request, we would refuse to sell them further quantities of our product. * * * In selling you Cream of Wheat it would be on the understanding that your purchases were for the sole use and sale from your own branch stores, and not to be resold or divided with your competitors, under any conditions.'

"In a letter written to Albrecht & Co., respondent stated: 'Please understand that we do not want any agreement with you, or anything like an agreement, as to how you shall resell our product. We simply reserve the right to refuse to sell you any more of our product in the event you did not see fit to comply with any request which we make of you, in connection with the sale of our product.' "

Similar letters to other dealers are set out in this finding.

"(25) The consideration referred to in respondent's letters, that members of chain stores 'cannot resist the temptation to cut the resale price below a figure which the retailer not connected with a chain store, but buying at the retail price directly from the wholesaler, can afford to sell it,' emphasizes the need which respondent felt of being assured in advance that the chain stores would not cut its resale prices, and the importance to it of securing some binding agreement or assurance in order to keep them in line. That those resale prices requested of retailers involved an inordinate profit to chain stores which paid no wholesalers' profits emphasizes also the suppression of competition involved by respondent's making their observance a condition of doing business with these chain stores."

"(28) * * * On March 2, 1921, re-

spondent telegraphed S. S. Pierce of Boston: 'In reply to your wire of even date, will say our New York agents advise us that you declined to maintain what we consider a fair resale price. We have consequently instructed them to decline your further orders until such time as this matter can be satisfactorily adjusted, if possible. We are writing you to-day fully.'

"On March 3, 1921, Lamont, Corliss & Co., of New York, respondent's sales agents in that territory, telegraphed respondent: 'Referring to Mr. Mapes' letter of February 21st, Pierce Company have restored price, and Mr. Eaton, their buyer, has satisfied us that they intend to abide by your terms without exception. May we release orders for 50 cases sent you February 26th.'

"On the same date respondent telegraphed Lamont, Corliss & Co.: 'Basing our action upon statements contained in your wire March 3d, you may sell S. S. Pierce Company until further advised.'"

Similar letters were written to a number of other chain stores.

"(29) Respondent's agents have been fully advised by respondent of its policy as to securing the observance of its resale prices, and have been furnished with copies of letters addressed to customers by respondent bearing on this subject in the agents' respective territories, and its agents have, at its direction and as part of their business relations to respondent, advised customers of respondent's resale prices and its terms of dealing or refusing to deal in respect thereto, and have conferred with customers and prospective customers as to their observance of such resale prices in the future, and reported to respondent agreements secured from dealers that they would observe such resale prices. These practices are illustrated by the following cases found in the record: Commission's Exhibit 77, pp. 1351–1355; Stip. Ex. 13; letters 2/17/21; Stip. Ex. 15, memo 8/20/19; agreements, Stip. Ex. 8, 10/19/20; Stip. Ex. 4, 3/3/31; Stip. Ex. 16; Commission's Exhibit 49, 3/2/21, 3/3/21, and telegram 3/3/21.

"Respondent upon numerous occasions instructed its agents to watch the merchandising methods of customers of respondent, in order to see that respondent's rules and requests were being complied with. Lamont, Corliss & Co., of New York, agents of respondent, were asked by respondent to advise it, should John T. Connor Company, of Boston, Mass., which had been accepted as a customer by respondent, fail to observe respondent's suggested or requested resale prices for Cream of Wheat. Commission's Exhibit 14, especially letter of 5/27/21."

Similar letters were written to other agents.

"(30) Respondent has utilized co-operative methods by which it has solicited and secured from customers or prospective customers themselves, or from other dealers or trade associations, information and reports as to whether or not such customers or prospective customers have maintained and are maintaining, or are disposed to maintain generally resale prices fixed by producers, or respondent's resale prices in particular, and solicited and secured reports, from customers, of customers who failed to observe its resale prices, and has investigated and verified such reports through further reports secured from customers as to such instances of price cutting, all with a view to refusing further sales to customers found to have cut its resale prices. Respondent has sought and secured agreements and understandings with customers and prospective customers that they would observe the resale prices designated by it. Respondent has sought and secured agreements, understandings, and assurances from customers, including chain stores, and from the National Chain Store Grocers' Association, that they would co-operate with it in securing the observance of its resale prices.

"Respondent from time to time addressed to prospective customers form letters or questionnaires, containing, among others, inquiries whether it was their policy to maintain strictly resale prices, and has from time to time addressed circular or uniform letters to customers in different cities or sections (Pittsburgh, Washington, Texas, California) where it had information price cutting existed, calling attention to such reports, and inviting more or less directly statements as to whether those addressed have or were at the time cutting prices. In December, 1921, respondent addressed such a letter to wholesalers in Pittsburgh, Pa., and Washington, D. C., referring to reports of price cutting, disavowing any desire for agreement of observance of its resale prices, stating that in case of price cutting 'we will undoubtedly refuse to sell such customer any further quantities of Cream of Wheat,' and concluding: 'In order that there may be no question about this matter, will you please write us, upon your receipt of this letter, and advise us definitely whether you now are, or have in the past, sold Cream of Wheat to your retail trade at a price less than that requested of you by us.' In cases where an early response was not forthcoming, re-

spondent wrote again, asking for a reply. These inquiries resulted in assurances in some cases of observances of respondent's resale prices and co-operation in their maintenance. Stip. Com. Ex. 1, par. 20; letters of 2/28/21, 3/26/21, 4/12/21, 4/22/21, and 5/19/22; Stip. Ex. 32; Stip. Ex. 36, 2/20/22; Com. Ex. 17, 4/3/19; Com. Ex. 26, letter to Merchants' Grocery Company 6/17/21; Ex. 31, 10/27/21, 10/28/21.

"(31) On complaint of competitor customers, respondent cut off price-cutter customers' supplies of Cream of Wheat and refused further to sell Cream of Wheat to such price-cutter customers, because such customers sold Cream of Wheat below suggested or requested minimum resale prices named by respondent. In June, 1922, respondent refused to sell Cream of Wheat to N. M. Crawford & Son, wholesale grocers of Coleman, Tex., who had theretofore been supplied, because a competitor of Crawford & Son complained of them as price cutters on Cream of Wheat; and Crawford & Son acknowledged that they had sold Cream of Wheat at a price below that requested by respondent as a resale price. Stip. Ex. 1."

And it also names a number of other merchants to whom it refused to sell for the same reasons.

"(32) On complaint of competitor customers, respondent refused to sell supplies of Cream of Wheat to price-cutter customers at the same prices and terms upon which it sold its product to customers who observed its suggested or requested minimum resale prices. Respondent placed such price-cutter customers upon probation, while penalizing them as to prices charged to them for Cream of Wheat. If, after probation over a period, the price-cutter customers had shown that they had reformed and had observed respondent's suggested or requested minimum resale prices on Cream of Wheat, respondent reinstated them upon the understanding that they should continue to observe such resale prices.

"February 7, 1921, upon information secured from Ariss, Campbell & Gault, sales agents at Portland, Or., that Mason, Ehrman & Co., wholesale grocers had sold Cream of Wheat at $8.75 a case, while the resale price named by respondent was $9 a case, respondent refused to sell further supplies of Cream of Wheat to Mason, Ehrman & Co., which it had theretofore supplied, giving as its reason that Mason, Ehrman & Co. had not observed the suggestion or requested minimum resale price named by respondent on its product (Commission's Exhibit 35, letters dated 2/7/21, 2/19/21, 2/25/21, 2/28/21, 3/4/21)," and others who it alleged it had been informed by its agents there they had cut prices.

"(33) Respondent asked customers to inform it of price cutting on Cream of Wheat by competitors of these customers, and promised to cut off such price cutters. Respondent received and acted upon such information.

"(34) Respondent systematically notifies, and has notified, prospective customers of Cream of Wheat of its policy looking toward maintenance of its suggested or requested resale prices in the sale of its product. Such notification is in such terms as to indicate that this is a condition which must be complied with if the customer wishes to continue to purchase supplies of Cream of Wheat from respondent. See references in connection with paragraph 28, above," setting out the names of a large number of prospective customers whom it had so notified.

"(35) When respondent secured, through advertisements, price lists, agents, customers, or from other sources, information of price cutting by its customers in the resale of Cream of Wheat, it wrote letters reiterating its policy that it would refuse to sell to a customer further supplies of Cream of Wheat, should the customer fail to respect or adhere to respondent's suggested or requested minimum resale prices. In some instances, if the information was verified, it cut off the customer at once; in others, respondent requested expressions by customers as to whether they were adhering to respondent's suggested or requested resale prices, or whether they intended to adhere to such prices, or expressions both as to whether they had adhered to such prices and whether they intended to adhere to such prices. Where customers were thus cut off, refusal to comply with respondent's requested or suggested resale prices was usually given as the reason for such cutting off," naming a large number of such dealers.

"(37) Respondent, for sales direct from its Minneapolis office, and after February, 1921, for practically all its sales, probably through stenciled numbers on its shipping cases, had a means of tracing the shipments of Cream of Wheat to dealers who had failed to adhere to its resale prices, or had supplied Cream of Wheat to dealers refused sales because of selling below respondent's resale prices, or had failed to observe its request not to divide shipments with others."

"(38) Among other features of respondent's policy and practices regarding resale prices stated by respondent's president and general manager in the correspondence with the National Chain Store Grocer's Associa-

tion is the following: After stating that, in case a customer sells Cream of Wheat at less than the requested resale price, respondent refuses to fill any of his future orders: 'In addition to the above will say, in case that any wholesale customer of ours does not see fit to comply with our request with regard to resale price, and as a consequence we refuse sales to him, we notify all of our other customers within a certain radius of our action in the premises, and request them in turn not to sell any of our goods to the party to whom we have refused sales. If any of our other customers last above alluded to do not see fit to comply with our request, but do resell our goods to the party to whom we have refused sales, we in turn refuse to sell to the party reselling our goods to the party to whom we have requested them not to sell.' Likewise, after stating that, if any of the chain branch stores 'for any reason whatever sold Cream of Wheat for less than our requested price, we would certainly refuse to sell that branch, and all the other stores of your company, any further quantity of Cream of Wheat,' respondent adds: 'And, in the event we did so refuse to sell your company Cream of Wheat, we would undoubtedly so advise all the other companies in your association, as well as wholesalers in your territory, and in advising them of our refusal to sell you we would request them not to resell Cream of Wheat. In the event they did sell you Cream of Wheat, contrary to our request, we would refuse to sell them further quantities of our product.' President Mapes' letter of March 26, 1921, makes the foregoing apply to all respondent's customers by the clause quoted in the preceding finding.

"Respondent admitted that it 'advised other customers, in some cases, that respondent had refused further sales to customers because of price cutting, suggesting that, 'in general interest of the trade, it would be good policy for you to decline filling any orders' from them, and that 'it would be for your best interests to decline to fill any orders for Cream of Wheat which they may see fit to place with you,' and in some cases declaring, variously, that, if customers refuse to observe this request, respondent 'refuses to sell,' or would refuse or intended to refuse to sell, such customers, and in at least one case respondent refused further sales to a customer because he had sold Cream of Wheat to another customer to whom respondent had refused to sell because of price cutting.' No case of such refusal to sell appears in the record.

"(39) After having stricken from its list of customers dealers who had failed to maintain respondent's suggested or requested resale prices in the sale of Cream of Wheat, respondent has, by means of letters or through its agents, notified other dealers of its action, and requested other dealers not to sell Cream of Wheat to the customers thus cut off, reinforcing respondent's request by an intimation or a threat that such sales to the rejected dealer would result in the seller also being cut off from supplies of Cream of Wheat by the respondent," stating the names of other dealers to whom letters to the same effect were sent by petitioner.

"(40) In some cases, dealers or associations of dealers have collected for respondent data as to whether its suggested or requested minimum resale prices were being maintained and aided in circulating statements as to its policy of minimum resale price control in the sale of Cream of Wheat. * * * Respondent co-operated with the Iowa-Nebraska-Minnesota Grocers' Association in sending to the members of that association, in the form of a circular letter of the association, a portion of a letter from respondent to H. A. Marr in which was set forth respondent's resale price maintenance policy and the consequence of failure by dealers to observe and adhere to such policy. This was accompanied by a warning paragraph from John Mehlhop, Jr., secretary and treasurer of the association, admonishing members against doing the thing that H. A. Marr, grocer, had done.

"(41) Resale price maintenance has been for years the special sales policy of respondent in the sale of Cream of Wheat. It has been aggressively asserted. When information has come to respondent that any vendee had failed to adhere to such policy, respondent has ordinarily adopted effective means of enforcing such observance through methods and agencies hereinabove set forth. * * * Such policy has not been changed although the methods of stating such policy and methods of enforcing such policy have been modified so as to be less direct. Since February, 1922, respondent has been less aggressive in its enforcement of its requested or suggested minimum resale prices for the sale of its product.

"(42) Respondent has had upon its books 6,500 live customers between January 1, 1913, and December 20, 1922. Of this number it has ceased to sell 2,000. Evidence in this proceeding shows that 53 were eliminated for failure to observe and adhere to respondent's suggested or requested resale prices, and of these 24 were later reinstated by respondent. It is not established by competent evidence

in this proceeding that a greater number than 53 customers were eliminated for such failure to observe respondent's resale prices, nor is it established by competent evidence in this proceeding that a greater number were not eliminated for such reason.

"(43) The respondent systematically represented to customers and prospective customers that it would refuse further sales to those who cut its resale prices, and it did so when it judged it necessary to its general policy of maintaining its resale prices."

"(45) Respondent's policy of naming and enforcing adherence to minimum resale prices for its product, by the methods above set forth, has had the capacity and tendency, and has had the effect, so far as enforcement has been successful, of substantially lessening and curtailing price competition among wholesale and retail customers, distributors of Cream of Wheat, and to enhance the price thereof, and to prevent the consuming public from getting the benefit from efficiency of operation on the part of more efficient dealers.

"(46) Respondent's policy of resale price maintenance by the methods above set forth has had the tendency and effect, as far as successful, in connection with the dominant position of Cream of Wheat in the market for purified middlings in package form, of lessening and curtailing price competition among distributors of package cereal foods prepared from purified middlings and to enhance the price of such package cereal foods to consumers.

"(47) Respondent's policy of naming and enforcing adherence to minimum resale prices for its product, taken in connection with its nation-wide advertising and its dominating position in the market for package cereals having as a base or raw material purified wheat middlings, has had the capacity and tendency, and in so far as its enforcement was successful, has had the effect of substantially lessening or curtailing price competition among producers of package cereal foods prepared from purified wheat middlings and to enhance the price of such package cereal foods to consumers and thus increase the cost of living.

"(48) Respondent, in naming and enforcing such resale prices, lessens, curtails, and prevents substantial competition between chain stores, vendees of respondent, and between such chain stores and other retail dealers, and it causes prices of such vendees to consumers to tend toward uniformity at or above the minimum resale prices named by respondent, and prevents chain stores from offering Cream of Wheat at the lower prices

which such stores could afford to ask because of lower operating expenses, and prevents consumer customers of these stores from securing such lower prices as might be secured were such chain stores free to name their own prices for the sale of Cream of Wheat without interference from respondent, and makes such consumer customers to pay for service which they have not asked for and have not received."

"(53) Respondent's policy of naming and enforcing resale prices in the sale of Cream of Wheat has the capacity and tendency to prevent, and, when successful, has had the effect of preventing the distribution of its product through the channels through which it would flow under conditions of free competition."

Upon these findings the Commission made the following order:

"Now, therefore, it is ordered that the respondent, Cream of Wheat Company, its officers, agents, employees, and successors, do cease and desist from carrying into effect its policy of securing the observance of minimum resale prices for its product, by co-operative methods in which the respondent and its distributors, customers and agents undertake to prevent others from obtaining the company's product at less than the prices designated by it, or from selling to others who fail to observe such prices—(1) by seeking and securing, directly or through its sales agents, contracts, agreements or understandings with customers or prospective customers that they will maintain the resale prices designated by it, or that they will co-operate with it to secure the observance by others of said resale prices; (2) by the practice of (a) soliciting and securing from customers or prospective customers themselves or from dealers or trade associations, information as to whether or not such customers or prospective customers have maintained and are maintaining, or are disposed to maintain generally resale prices fixed by producers, or, respondent's resale prices in particular; and (b) soliciting and securing reports from customers, or customers who fail to observe its resale prices, and investigating and verifying such reports through further reports secured from customers as to such instances of price cutting, all with a view to refusing further sales to customers found to have cut its resale prices; (3) by notifying other customers, in case of refusal by respondent of further sales to price cutters, of such refusal and requiring them not to sell such price cutters on pain of themselves being refused further sales; (4) by employing its sales agents to assist in such

plan by reporting dealers who have failed to observe its resale prices, and to secure adherence thereto from customers or prospective customers, and furnishing said agents the names of customers to whom it has refused further sales because of price cutting, and instructing them not to sell to such customers; (5) by requiring an extra price for its product from price cutters in order to secure from them assurance of their future observance of its resale prices as a condition of reinstatement on the regular basis; or (6) by utilizing any other equivalent co-operative means of accomplishing the maintenance of prices fixed by respondent.

"It is further ordered that the respondent, Cream of Wheat Company, shall within sixty (60) days after the service upon them of a copy of this order, file with the Commission a report in writing setting forth in detail the manner and form in which they have complied with the order to cease and desist hereinbefore set forth."

The principal authority upon which the petitioner relies is United States v. Colgate & Co., 250 U. S. 300, 39 S. Ct. 465, 63 L. Ed. 992, 7 A. L. R. 443. But this is clearly distinguishable from the case at bar. The facts in that case were that the defendant was indicted, but the indictment made no reference to monopoly, and proceeded solely upon the theory of an unlawful combination. Its inapplicability to the facts in this case is fully shown in United States v. A. Schrader's Son, Inc., 252 U. S. 85, 99, 40 S. Ct. 251, 64 L. Ed. 471, and Frey & Son v. Cudahy Packing Co., 256 U. S. 208, 41 S. Ct. 451, 65 L. Ed. 892, opinions in both cases by Mr. Justice McReynolds, who had also delivered the opinion of the court in the Colgate Case.

In Federal Trade Commission v. Beech-Nut Co., 257 U. S. 441, 42 S. Ct. 150, 66 L. Ed. 307, 19 A. L. R. 882, Justice Day delivering the opinion of the court, referring to the Colgate Case, said:

"The Colgate Case was prosecuted under the Sherman Anti-Trust Act and came to this court under the Criminal Appeals Act. We therein held that this court must accept the construction of the indictment as made in the District Court, and that, upon such construction, the only act charged amounted to the exercise of the right of the trader, or manufacturer, engaged in private business, to exercise his own discretion as to those with whom he would deal, and to announce the circumstances under which he would refuse to sell, and that, thus interpreted, no act was charged in the indictment which amounted to a violation of the Sherman Act, prohibiting monopolies,

contracts, combinations, and conspiracies in restraint of interstate commerce."

Both parties rely to some extent on the Beech-Nut Case. It will be noted that the order of the Commission in the instant case follows the order directed to be made in the Beech-Nut Case closely, although there are some slight changes to conform to the findings of facts.

Counsel for petitioner, while insisting that the Commission was not warranted in making any order, contends that, if, upon the facts, any order was permissible, some of them are too far-reaching.

[2] That, on the findings made by the Commission, the petitioner was guilty of unfair methods of competition in interstate commerce which constitute a violation of the act to create a Federal Trade Commission has been clearly determined in the Beech-Nut Case, supra; Hills Bros. v. Federal Trade Commission, 9 F.(2d) 481 (C. C. A. 9); Toledo Pipe, etc., Co. v. Federal Trade Commission, 11 F.(2d) 337, 341 (C. C. A. 6); Moir v. Federal Trade Commission, 12 F.(2d) 22 (C. C. A. 1), in which the authorities are learnedly reviewed.

In the Beech-Nut Case the court, after stating the facts which were similar to the findings made by the Commission in the instant case, said on page 454 (42 S. Ct. 154):

"The system here disclosed necessarily constitutes a scheme which restrains the natural flow of commerce and the freedom of competition in the channels of interstate trade which it has been the purpose of all the Anti-Trust Acts to maintain. In its practical operation it necessarily constrains the trader, if he would have the products of the Beech-Nut Company, to maintain the prices 'suggested' by it. If he fails so to do, he is subject to be reported to the company either by special agents, numerous and active in that behalf, or by dealers whose aid is enlisted in maintaining the system and the prices fixed by it. Furthermore, he is enrolled upon a list known as 'Undesirable—Price Cutters,' to whom goods are not to be sold, and who are only to be reinstated as one whose record is 'clear' and to whom sales may be made upon his giving satisfactory assurance that he will not resell the goods of the company except at the prices suggested by it, and will refuse to sell to distributors who do not maintain such prices.

"From this course of conduct a court may infer, indeed cannot escape the conclusion, that competition among retail distributors is practically suppressed; for all who would deal in the company's products are constrain-

ed to sell at the suggested prices. Jobbers and wholesale dealers who would supply the trade may not get the goods of the company, if they sell to those who do not observe the prices indicated or who are on the company's list of undesirables, until they are restored to favor by satisfactory assurances of future compliance with the company's schedules of resale prices. Nor is the inference overcome by the conclusion stated in the Commission's findings that the merchandising conduct of the company does not constitute a contract or contracts whereby resale prices are fixed, maintained, or enforced. The specific facts found show suppression of the freedom of competition by methods in which the company secures the co-operation of its distributors and customers, which are quite as effectual as agreements express or implied intended to accomplish the same purpose. By these methods the company, although selling its products at prices satisfactory to it, is enabled to prevent competition in their subsequent disposition by preventing all who do not sell at resale prices fixed by it from obtaining its goods.

"Under the facts established, we have no doubt of the authority and power of the Commission to order a discontinuance of practices in trading, such as are embodied in the system of the Beech-Nut Company."

In the Toledo Pipe-Threading Machine Co. v. Federal Trade Commission Case, after an analytical review of the decisions of the Supreme Court, it was said:

"In the present state of the decisions and in spite of the adverse comments of Mr. Justice Holmes in the case itself [Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U. S. 373, 31 S. Ct. 376, 55 L. Ed. 502] and by the minority in the Schrader Case, 252 U. S. 85, 40 S. Ct. 251, 64 L. Ed. 471, we think we must treat the case as holding that the competition which may exist between the jobbers of the same proprietary or patented article is within the class of competition which is protected by the Sherman Act against restraint by contract, and that a system of express price maintenance contracts is inherently such a substantial and direct restriction of competition as to be forbidden by that law."

See, also, Q. R. S. Music Co. v. Fed. Trade Commission, 12 F. (2d) 730 (C. C. A. 7).

Counsel for petitioner frankly admitted in his able oral argument that, if the Commission was justified to make any order in the case, requiring the petitioner to desist from the practices set out, paragraphs 1, 3, and 5 are unobjectionable. Their objections

are to paragraphs 2 (a) and (b) and paragraphs 4 and 6.

[3] The objections to paragraph 2 (a) are that the petitioner construes it as directing petitioner to desist from securing from customers or prospective customers, or from dealers or trade associations reports of customers, who fail to observe its resale prices. But the order does not warrant such an interpretation. The language is to desist from "soliciting and securing" from customers, etc., such information. Merely securing the information is not prohibited, unless the information is also "solicited." If the order had employed the disjunctive "or," instead of the conjunctive "and," counsel's contention would be entitled to greater consideration, a question not before us and not decided. This order does not prohibit the petitioner from acting on information received by it without solicitation, but communicated to it voluntarily by some of its customers, or from advertisements of price cuttings. This also applies to the objections to paragraph 2 (b).

[4] Paragraph 4 only requires the petitioner to desist from "employing its sales agents to assist in such plan by reporting dealers who have failed to observe its resale prices, * * * and furnishing said agents the names of customers to whom it has refused further sales because of price cutting, and instructing them not to sell to such customers." The words "to assist," in such plan, must be construed in connection with paragraphs 2 (a) and 2 (b) "to solicit and secure," and is limited to information solicited and secured from customers, etc., the names of customers guilty of price cutting, or, in other words, they must not solicit customers to furnish them with information of those cutting prices of the articles manufactured and sold to the trade by the petitioner, and act on information thus obtained.

[5] It is the co-operative methods in which the petitioner and its distributors and agents act, to prevent price cutters from obtaining its goods, which it is commanded to desist from. If petitioner's agents are to be permitted to solicit from customers information of those cutting prices, and act in co-operation with these customers to ascertain the names of customers who cut prices, the effect would be the same as if the information had been solicited and obtained by petitioner, as it is a corporation, and can act only through its agents, whether they are officers or sales agents. The acts of the corporation's agents within their authorized employment are the acts of the corporation. Construing the or-

ders in these paragraphs as we find they are evidently intended by the Commission, we find them unobjectionable.

[6] The objections on behalf of the petitioner to paragraph 6 of the order are that it is too indefinite, not specific enough to enable it to determine what acts may be in violation of that order, and subject them to prosecution, when no violation is intended. It thereupon requested the Commission to add the following proviso to that paragraph:

"Provided, however, that nothing herein shall prevent the respondent from performing the following acts: (a) Requesting its customers not to resell Cream of Wheat at less than a stated minimum price. (b) Refusing to sell to a customer, because he resells below such requested minimum price, or because of other reasons. (c) Announcing in advance its intention thus to refuse. (d) Informing itself, through its soliciting agents, and through publicly circulated advertisements of customers which come to its attention, and through other legitimate means, without any co-operative action with its other customers or other persons, as to the prices at which Cream of Wheat is being sold."

While paragraph 6 should be construed in connection with the preceding paragraphs as construed by us, by applying Lord Tenterden's rule of "ejusdem generis," still, in order that there may be no misapprehension on the part of the petitioner as to what is intended by the Commission by the broad language used in this paragraph, we are of the opinion that the requests should have been granted.

Amending paragraph 6 by adding this proviso, the order of the Commission, as thus amended, is affirmed.