## UNITED STATES v. ETHYL GASOLINE CORPORATION et al.

District Court, S. D. New York.
May 19, 1939.

Lamar Hardy, of New York City, by John Henry Lewin, of Baltimore, Md., Hammond E. Chaffetz, W. B. Watson Snyder, Grant W. Kelleher, Nelson A. Sharfman, and Thurman Arnold, all of Washington, D. C., and Samuel E. Darby, Jr., of New York City, for the United States.

Cooper, Kerr & Dunham, of New York City, by Drury W. Cooper, of New York City, Harold W. Norman, of Chicago, Ill., and Robert S. Dunham, of New York City, for defendants.

BONDY, District Judge.

This is a suit in equity by the United States to enjoin the Ethyl Gasoline Corporation and its president and vice-president in charge of sales, from violating the Sherman Anti-Trust Act of July 2, 1890, 15 U.S.C.A. § 1 et seq. The case has been submitted upon an agreed statement of facts.

The defendant corporation is engaged in the production and sale of a fluid, consisting principally of tetraethyl lead. This fluid is used in increasing the octane, or anti-knock, rating of gasoline. The mixture of this fluid with gasoline reduces or eliminates the knocking that normally occurs when a mixture of gasoline and air is burned in an automobile engine of relatively high compression.

The defendant corporation is the sole producer of tetraethyl lead fluid in the United States. It is the owner of United States letters patent which cover the anti-knock fluid, the combination consisting of the fluid and gasoline, and the method whereby a mixture of gasoline and air is burned in a motor of relatively high compression, in the presence of vapors of an

anti-knock ingredient. No other substance similar to tetraethyl lead fluid is manufactured or sold commercially. There are other competitive methods by which a high octane value of gasoline may be obtained. Most refiners, however, find it economical and advantageous to obtain a part of the anti-knock value of their regular and premium gasoline by the use of fluid. Approximately 70% of all gasoline manufactured and sold in the United States is treated with fluid, and approximately 85% of all gasoline sold in the United States which has been processed so as to obtain a high octane rating is treated with fluid.

The defendant corporation does not manufacture, refine or sell any gasoline. It manufactures fluid and sells it only to refiners licensed by it, who mix the fluid with their own gasoline pursuant to the regulations and directions prescribed by the defendant corporation. It derives its profits, which are very substantial, solely from the sale of fluid.

The greater part of all gasoline manufactured at refineries and the greater part of all gasoline treated with fluid, is sold and transported in interstate commerce from the states in which the refineries are located into each of the other states of the United States.

The refining companies sell gasoline partly through wholesale and retail outlets owned and controlled by them. They also sell gasoline to independent retail dealers and consumers and to jobbers for resale to retail dealers and consumers. There are approximately 12,000 jobbers in the United States. They distribute a substantial part of all the gasoline sold and distributed in this country.

The defendant corporation has issued licenses to approximately 123 refiners, who together refine and sell about 88% of all the gasoline sold in the United States. All but one of the major refiners in this country have entered into such license agreements and all but two of the licensees treat with fluid substantially all of their regular or so-called house brands of gasoline. Defendant corporation licenses the refiners to produce "Ethyl" gasoline and "regular" gasoline, by treating their gasoline with the fluid manufactured and sold by it. Ethyl gasoline has a higher octane rating than regular lead-treated gasoline. The former contains approximately one part of fluid to 1700 parts of gasoline and the latter one part of fluid to 4200 parts of gasoline. About 94% of all gasoline treated with fluid is regular gasoline.

The license agreements with the refiners require each refiner to maintain a minimum differential in price between his Ethyl gasoline and his best non-premium grade of gasoline, and provide that regular gasoline treated with fluid shall be sold as the next highest priced motor fuel below the refiner's Ethyl gasoline and shall be the refiner's best non-premium gasoline.

The refiners are permitted under their licenses to sell treated gasoline to such jobbers only as are licensed by defendant corporation to distribute treated gasoline. This provision has almost invariably been complied with by the refiner licensees. Jobbers desiring licenses are required to make application therefor through their prospective refiner-suppliers, who submit such applications to the defendant corporation. It issues separate licenses to jobbers for distributing Ethyl and regular treated gasoline. Approximately 11,000 of the 12,000 jobbers in the country have been granted such licenses. Numerous applications for jobber licenses have been denied. Many licenses were granted to persons to whom licenses were at first denied. Apart from the issuance of licenses to jobbers, the only business relations of defendant corporation with jobbers are in connection with the promotion of sales by jobbers of treated gasoline and the investigation of jobbers.

When tetraethyl fluid was first introduced, the question arose whether the manufacture, distribution and use of the fluid and of treated gasoline might not create a serious health hazard. An investigation was conducted by distinguished scientists appointed by the Surgeon General of the United States, who found that there was no serious menace to health if certain precautionary measures were taken. In conformity with the recommendations of the United States Public Health Service, the license agreements with jobbers provide that jobber licensees shall maintain on pumps from which treated gasoline is dispensed, notices that the gasoline contains lead and is for use as a motor fuel only.

The jobber licenses prohibit dilution and adulteration of the treated gasoline. On the rare occasions when dilution or adulteration of regular treated gasoline has been discovered by the defendant corporation, it has ordinarily been necessary

only to report the matter to the refiner-supplier, in view of the latter's interest in the quality of his product. Defendant corporation customarily investigates instances where the lead warning signs have not been placed upon the dispensing pumps, and where untreated gasoline has been substituted for treated gasoline in pumps bearing such signs. It also seeks to prevent dilution of Ethyl gasoline and deterioration of such gasoline through long storage in jobbers' or dealers' tanks.

The Ethyl Gasoline Corporation is the exclusive user of trade-marks embodying the words "Ethyl" and "Q" as applied to fluid. All licensees except one, include the word "Ethyl" as a part of the brand name under which Ethyl gasoline is sold. All licensees are required to display defendant corporation's registered trade-mark design whenever they sell, offer to sell or advertise Ethyl gasoline. Defendant corporation has registered this design and the word "Ethyl" in every state of the United States except one. It has extensively advertised the Ethyl trade-mark and Ethyl gasoline, and the refiner licensees have extensively advertised their respective brands of Ethyl gasoline. The defendant corporation, however, obligates its refiner and jobber licensees not to use its trade-marks, designs, or its name in the sale, offering for sale or advertising of regular lead-treated gasoline. It is stipulated that numerous users of gasoline would testify that the name "Ethyl" and the trade-mark design have become associated in their minds with high quality gasoline of high anti-knock qualities and that Ethyl indicates to them the use of lead in gasoline.

Since April, 1929, each applicant for a jobber license has been investigated by a field representative of the defendant corporation. These representatives exercise wide discretion in recommending the granting or refusal of jobber licenses and their recommendations largely determine whether a license will be issued. Officials of the corporation charged with reviewing these jobber reports have almost invariably adopted the field representative's recommendation when approved by his division manager. The action of the division manager in this regard is usually perfunctory.

A manual issued by the corporation to its field representatives states that the reason for investigations prior to the issuance of license agreements is to ensure that all marketers of Ethyl gasoline will be of a high type and will be people who will maintain the quality of the gasoline, protect the reputation that the Ethyl corporation has established for its product and will not resort to unethical methods in competing with other licensed jobbers and refiners.

Following the corporation's customary practice, its field representatives usually have not set forth the reasons why recommendations have been made against the issuance of licenses, largely due to its reluctance to preserve in its records the extent to which maintenance of gasoline prices and marketing policies by jobbers entered into the granting of licenses. Usually no records other than the reports themselves have been made or preserved disclosing the reasons why jobber licenses have been refused. The extent of the reliance placed by the corporation on the "business ethics" of jobbers has normally not been disclosed in its records and communications. Defendants employed the term "business ethics" to denote compliance with marketing policies and prevailing prices of the petroleum industry.

From April, 1929, to January, 1935, one of the questions appearing on the form of jobber report related to the "business ethics" of the jobber applicant. In January, 1935, this question was eliminated from the form of the jobber report, but the "business ethics" of the jobber have continued to be among the principal subjects of investigation. The findings of the field representatives with respect thereto are incorporated in the recommendations for or against the issuance of a license, made at the end of the report.

An adverse finding upon the "business ethics" of a prospective jobber licensee is alone in many instances sufficient ground for defendant corporation to refuse such jobber a license. The greatest number of jobber applicants who were denied licenses (and numerous applications have been denied) were rejected on the basis of adverse findings of field representatives concerning the jobbers' "business ethics." In a number of instances where licenses were granted to jobbers whose practices were previously considered unsatisfactory, they were issued after representation that the jobber's marketing practices would be changed. In at least an equal number of instances licenses were refused by defendants after similar representations.

It is also stipulated that defendants have refused to issue licenses to a number

of jobbers who, investigation showed, were not abiding by the marketing policies prevailing or ostensibly prevailing in the industry or who were not mantaining the retail prices on gasoline posted generally in the industry (that is, the policies of, and prices posted by, the major oil companies or the market leaders among such companies) or whose retail dealers were not maintaining such prices.

It is stipulated that testimony of witnesses for the Government would tend to establish that a large number of refiners and a majority of jobbers believe that a jobber must maintain "business ethics" in order to obtain a license, and that a number of jobbers believe that jobber licensees are required to maintain the prices and abide by the marketing practices and policies of the major oil companies.

Supplemlentary investigations of licensed jobbers are made from time to time by the defendants and reports thereon made on the same report forms as are used for the initial investigation. The operations of jobber licensees have been investigated partly to determine whether they were maintaining the marketing policies, practices and prices prevailing or ostensibly prevailing in the industry. In the corporation's instructions to its field representatives, it states that through these supplementary investigations it has been able to correct the Ethyl marketing picture to a considerable extent and has succeeded in eliminating from its jobber lists some of its former accounts which were not a credit to it.

Some of the division managers and field representatives have from time to time reported to the jobbers' suppliers that jobbers have not been abiding by the suppliers' marketing policies and practices, and there have been sporadic instances in which representatives of defendant corporation in cooperation with the suppliers, have persuaded jobbers to market gasoline in accordance with the suppliers' marketing practices.

Some applications for Ethyl jobber licenses and a few for regular gasoline jobber licenses have been refused because the volume of business of the jobber was not sufficient, in the opinion of defendant corporation, to move the gasoline with sufficient rapidity to avoid deterioration in storage. A number of jobber licenses have been refused because in the opinion of defendant corporation the physical equipment of the jobber lent itself to the actual or accidental mixing of different grades or brands of gasoline, or the retail outlets of the jobber were shabby or disreputable in appearance or location, or the jobber's reputation in his community was bad, or the jobber had a record of tax evasion, dilution, substitution or misbranding.

Defendant corporation has issued licenses to a number of jobbers who, investigation showed, were not abiding by the prices prevailing or ostensibly prevailing in the industry or who were not maintaining retail prices on gasoline posted generally in the industry or whose retail dealers were not maintaining the prices prevailing or ostensibly prevailing in the industry.

Defendant corporation has investigated the operations of jobber licensees to determine the method of securing supplies, gallonage, pump marking, facilities of bulk plant and nature of other physical equipment, number, character and appearance of outlets and sales effort.

Defendants have not issued any statement or instructions to the effect that they would cancel licenses for the failure to maintain "business ethics" and there has been and is a great deal of cutting of prices below the posted prices on the part of licensed refiners, including major oil companies, and licensed jobbers. Jobber licenses have not been cancelled because of the failure of a jobber to maintain the policies, practices and prices of the major oil companies or market leaders. There were numerous instances where jobber licensees have not followed the marketing practices prevailing or ostensibly prevailing in the industry and where jobber licensees have not maintained retail prices posted generally in the industry concerning whom no action has been taken by defendants. Except in cases of breach of license agreement, or where the jobber's contract with his supplier had not been terminated (in which case the jobber's existing license was continued in effect), defendant corporation in most cases has granted a new license to a jobber who wanted to change his source of supply, irrespective of the jobber's maintenance or non-maintenance of the policies, practices and prices of the major oil companies or market leaders. In a few instances it has not done so.

The petition prays that the monopoly, combination and conspiracy described

therein be declared illegal and in violation of the Sherman Anti-Trust Act; that the defendants be enjoined from continuing the unlawful practices described and, particularly, from exacting agreements from the refiners limiting the sale of lead-treated gasoline to such jobbers only as defendants license or otherwise designate, and from requiring jobbers to procure licenses.

The Government in its brief states that "this case is concerned only with the legality of that part of the defendants' licensing system and practices which relates to gasoline jobbers, whereby refiner licensees have each agreed with defendant corporation to sell fluid treated gasoline to such jobbers only as have received licenses from the defendant corporation."

The Government contends that the defendants have imposed unlawful restraints first, upon jobbers to whom licenses have been issued, by compelling them to participate in agreements or understandings to maintain resale prices, and second, upon jobbers to whom licenses have been denied, who have been excluded from the market as a result of defendants' agreements with the refiner licensees.

■■ First. A price maintenance agreement between a manufacturer or trader and his dealers is forbidden by the Sherman Act. Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502. The interdiction of the statute extends to informal agreements implied from a course of dealing or other circumstances. United States v. A. Schrader's Son, Inc., 252 U.S. 85, 40 S.Ct. 251, 64 L.Ed. 471; Federal Trade Commission v. Beech Nut Packing Co., 257 U. S. 441, 42 S.Ct. 150, 66 L.Ed. 307, 19 A. L.R. 882; cf., Frey & Son, Inc., v. Cudahy Packing Co., 256 U.S. 208, 41 S.Ct. 451, 65 L.Ed. 892. No immunity is conferred by the fact that the article whose price is being regulated is a patented product. Bauer & Cie v. O'Donnell, 229 U.S. 1, 33 S.Ct. 616, 57 L.Ed. 1041, 50 L.R.A.,N.S., 1185, Ann.Cas.1915A, 150; Straus v. Victor Talking Machine Co., 243 U.S. 490, 37 S.Ct. 412, 61 L.Ed. 866, L.R.A.1917E, 1196, Ann.Cas.1918A, 955.

■■ In the absence of an agreement or understanding between them, or of the suppression of the freedom of competition by methods in which the manufacturer secures the cooperation of his distributors and customers, Federal Trade Commission v. Beech Nut Packing Co., 257 U.S. 441,

455, 42 S.Ct. 150, 66 L.Ed. 307, 19 A.L.R. 882, it is not unlawful for a manufacturer to suggest resale prices to his dealers, refuse to sell goods to those who do not maintain those prices and announce to the trade that such is his policy. United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992, 7 A.L.R. 443; Frey & Son, Inc., v. Cudahy Packing Co., supra. These activities are considered lawful incidents of the right of a "trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." United States v. Colgate & Co., 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992, 7 A.L.R. 443. The investigation by a manufacturer of the price policies of his dealers is not per se unlawful, Toledo Pipe-Threading Machine Co. v. Federal Trade Commission, 6 Cir., 11 F.2d 337; Cream of Wheat Co. v. Federal Trade Commission, 8 Cir., 14 F.2d 40, although when combined with other significant facts, it may support a finding of unlawful price control. Federal Trade Commission v. Beech Nut Packing Co., supra.

It is evident that while the distinctions between lawful and unlawful activities may be quite clear in theory, it is not always easy in practice to determine whether the trader has kept within the bounds of his privilege. It is unfortunate, therefore, that the present case has been submitted upon an agreed statement of facts, thus depriving the court of the benefit of the direct testimony of witnesses.

The defendant corporation, although neither a manufacturer of, nor trader in, lead-treated gasoline, concededly takes an interest in and investigates, the price policies of its jobber licensees and of applicants for jobber licenses, and it is also admitted that jobbers have been refused licenses because their price policies were offensive to the defendant corporation. But although a majority of jobbers believe that a jobber must have maintained resale prices in order to obtain a jobber license and a number of them also believe that they are required to maintain prices after the issuance of a license, there is no evidence that the defendants have informed any jobber to that effect and it affirmatively appears that defendants have not issued any statement or instructions that they would cancel licenses for failure to maintain prices. Moreover, there has been and is a great deal of price cutting on the

part of licensed jobbers, yet licenses have not been cancelled for that reason.

It is stipulated that in a number of instances where licenses were granted to jobbers whose "practices" were previously considered unsatisfactory, they were issued after representation that the jobber's "marketing practices" would be changed; that some of the defendant corporation's employees have from time to time reported to the jobbers' suppliers that jobbers have not been abiding by the suppliers' "marketing policies and practices", and that there have been sporadic instances in which representatives of defendant corporation, in cooperation with the jobbers' suppliers, have persuaded jobbers to market gasoline in accordance with the suppliers' "marketing practices". The Government relies heavily upon these facts. But it is not certain that the "marketing policies" and "marketing practices" referred to, include "price policies", in view of the separate and apparently distinctive use of these terms in the stipulation of facts. Although the stipulation of facts defines "business ethics" as including the "marketing policies and prevailing prices of the petroleum industry", it does not state that "marketing policies" or "marketing practices" are synonymous with "price policies."

A clear case of price maintenance thus is not made out, especially in view of the indefinite language of the stipulation. That an agreement or understanding for the maintenance of prices existed between defendants and their jobber licensees is perhaps a permissible but not a necessary conclusion from the stipulated facts. As the case can be disposed of on other grounds, it is unnecessary to pass upon this issue.

■■ Second. The Ethyl Gasoline Corporation has entered into license agreements with approximately 123 refiners, who together refine and sell about 88% of all the gasoline sold in the United States. These include all except one of the major refiners in this country. Each of the refiner license agreements provides that lead-treated gasoline may be sold to those jobbers only who are licensed by the defendant corporation and this provision is almost invariably complied with by the refiner licensees. Since the defendants have denied numerous applications for jobber licenses, many persons desiring to engage as jobbers in the sale of lead-treated gaso-line, which comprises about 70% of all the gasoline manufactured and sold in the United States, have been excluded from the market. The unsatisfactory "business ethics" of the jobbers has been the principal reason for such exclusion.

This provision of the refiner license agreements clearly is in restraint of trade. Each agreement calls for cooperative action between the defendant corporation and its refiner licensee in the exclusion of unlicensed jobbers from the market. While a manufacturer or trader may refuse to deal with those who do not observe the resale prices suggested by him, he may not combine or enter into agreements with intermediate distributors to cut off the supplies of such dealers. Victor Talking Machine Co. v. Kemeny, 3 Cir., 271 F. 810; Straus v. Victor Talking Machine Co., 2 Cir., 297 F. 791; cf. Federal Trade Commission v. Beech Nut Packing Co., supra. Although this record may not warrant a finding that the refiner licensees have entered into a combination or conspiracy with each other and with the defendants, the conceded facts are that one hundred and twenty-three exclusion agreements have been separately made by the defendants and their refiner licensees. Each such agreement deprives the unlicensed jobber of one source of supply, while the aggregation of agreements deprives him of all access to the lead-treated gasoline market. Defendants, through these separate agreements, have accomplished what the refiners, without the defendants' aid, could achieve only by a concerted refusal to deal with the jobbers who did not maintain "business ethics." The defendants can fare no better with their system of separate agreements than could the refiners if they formed such a combination. See Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 408, 31 S.Ct. 376, 55 L. Ed. 502. The agreements between the defendants and their refiner licensees accordingly constitute a forbidden restraint of trade. Cf., Straus v. American Publishers' Association, 231 U.S. 222, 34 S.Ct. 84, 58 L.Ed. 192, L.R.A.1915A, 1099, Ann.Cas. 1915A, 369; Eastern States Retail Lumber Dealers' Association v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490, L.R. A.1915A, 788; Binderup v. Pathé Exchange, 263 U.S. 291, 44 S.Ct. 96, 68 L.Ed. 308; United States v. American Livestock Commission Co., 279 U.S. 435, 49 S.Ct. 425, 73 L.Ed. 787; United States v. First National Pictures, Inc., 282 U.S. 44, 51

S.Ct. 45, 75 L.Ed. 151; Sugar Institute v. United States, 297 U.S. 553, 56 S.Ct. 629, 80 L.Ed. 859.

The defendants, attempting to establish the reasonableness of their actions, Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R. A.,N.S., 834, Ann.Cas.1912D, 734; United States v. American Tobacco Co., 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663; Sugar Institute, Inc., v. United States, 297 U.S. 553, 56 S.Ct. 629, 80 L.Ed. 859; Interstate Circuit, Inc. v. United States, 59 S.Ct. 467, 83 L.Ed. ——, decided by the Supreme Court February 13, 1939, contend that they have the right to require that jobbers dealing in lead-treated gasoline be licensed, in order to preserve the trade-marks, good will and reputation of defendant corporation in lead-treated gasoline, to protect the public from adulteration and to secure compliance with the regulations proposed by the Surgeon General of the United States governing the sale of lead-treated gasoline to the public. These objectives, however, bear no relation to, and, in the absence of statutory permission, do not require or justify, the exclusion from the market of jobbers because their marketing or price policies are repugnant to the defendants. It is because the defendants have not confined themselves to the attainment of the ends mentioned but have used their licensing system for other purposes that the Government seeks to restrain their licensing activities. Cf. Sugar Institute, Inc., v. United States, 297 U.S. 553, 599, 601, 56 S.Ct. 629, 80 L.Ed. 859.

Defendants maintain that they are vitally interested in protecting the health of persons handling lead-treated gasoline and in securing compliance with the regulations proposed by the Surgeon General of the United States. While it may be true, as the Government contends, that the health hazard relates to the handling of the tetraethyl fluid itself and not to the fluid-treated gasoline, the court can not say that the defendants have not a legitimate interest in the maintenance of lead warning notices on the pumps from which treated gasoline is dispensed to the public, which apparently is the only one of such health regulations applicable to the handling and distribution of treated gasoline by jobbers.

The refiner licenses contain a provision, which is not attacked in this suit, requiring refiners, first, to obligate their jobbers to comply with the health regulations and to impose similar obligations upon purchasers from them for resale, and second, to reserve the right to cancel contracts of sale in the event that the jobber does not comply with such regulations. Defendants contend that the refiner has been tried and found wanting, but this apparently was due to an unwillingness on the part of refiners to conduct their own investigations of the jobbers' retail outlets. There does not appear to be any reason why this provision in the refiner license agreements can not accomplish its purpose when supplemented by investigations conducted by the defendant corporation itself, just as is presently done. The court is not concerned with determining defendants' future policies or practices regarding the enforcement of these health regulations, but the court is satisfied that the jobber licensing system is not the only method by which observance of the health regulations by jobbers can be enforced. Moreover, as the Government points out, there would seem to be a complete absence of any temptation on the part of jobbers to avoid compliance with the regulations concerning lead warning signs since these signs are supplied by the Ethyl corporation at a charge of only seven cents each.

It is equally evident that whatever interests the defendant corporation has in preventing dilution, adulteration and deterioration of treated gasoline in the hands of jobbers may be protected without any resort to the jobber license device. Cf., International Business Machines Corp. v. United States, 298 U.S. 131, 139, 140, 56 S.Ct. 701, 80 L.Ed. 1085.

Defendants seek to avoid the effect of the anti-trust laws and to support their requirement that jobbers be licensed on the ground that they are merely taking advantage of their patent rights, relying upon the nature of patent monopoly and the decision of the Supreme Court in United States v. General Electric Co., 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362.

The defendant corporation concededly is entitled to the full benefit of its patents. But the rights which attach to the ownership of a patent are not limitless. The courts have frequently defined and limited the scope of the patent monopoly.

In the General Electric case, 272 U.S. 476, 489, 490, 47 S.Ct. 192, 196, 71 L. Ed. 362, the Supreme Court established the principle that a patentee may grant a license "upon any condition the performance

of which is reasonably within the reward which the patentee by the grant of the patent is entitled to secure," and may restrict the selling of the patented article by his licensee by limiting the method of sale and the price, "provided the conditions of sale are normally and reasonably adapted to secure pecuniary reward for the patentee's monopoly." See also General Talking Pictures Co. v. Western Electric Co., 305 U.S. 124, 127, 59 S.Ct. 116, 83 L.Ed. 81. The reasoning in both cases establishes that the legality of the conditions imposed by the patentee upon his licensee is a question to be determined by the court and not, as contended by defendants, a question of policy reserved for the judgment of the patentee. In the General Electric case both the patent owner and its licensee manufactured and sold the patented product. The court merely decided that the patent owner could fix the prices and prescribe the method of sale of the patented product manufactured by the licensee in order to sustain the prices at which the former sold the patented product. See E. Bement & Sons v. National Harrow Co., 186 U.S. 70, 22 S.Ct. 747, 46 L.Ed. 1058; Straight Side Basket Corp. v. Webster Basket Co., 2 Cir., 82 F.2d 245, 246.

■■■ The defendant corporation does not charge any royalty for the use of its patents, nor does it manufacture, refine or sell any gasoline, whether treated with fluid or not. It is engaged only in the sale of fluid and derives its profits solely from the sale of fluid to its refiner licensees. Its pecuniary interest, if any, in the marketing and price policies of the jobbers selling gasoline is obviously very remote. Cf. Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 407, 31 S.Ct. 376, 55 L. Ed. 502; Bauer & Cie v. O'Donnell, 229 U. S. 1, 16, 33 S.Ct. 616, 57 L.Ed. 1041, 50 L.R. A.,N.S., 1185, Ann.Cas.1915A, 150. Moreover, the Ethyl Gasoline Corporation does not itself determine the prices or policies, the failure to abide by which has often resulted in the denial of a jobber license. They are the prices and policies established by some of the refiner licensees, apparently without consulting the defendant corporation. There is no evidence that the refiner licensees can not adequately protect such interests as they may lawfully have in the maintenance of the resale prices of their jobber customers, without any intervention by the Ethyl corporation.

General Talking Pictures Co. v. Western Electric Co., supra, involved a limitation in a license to manufacture and sell a patented product, restricting the licensee to sales of the product for private use in radio reception, as distinguished from commercial use in talking picture equipment. Since the patentee therein retained the right to license other persons to manufacture and sell the product for use in the commercial field, the limitation obviously bore a direct relation to the patentee's pecuniary reward. The Ethyl Gasoline Corporation, however, does not restrict sales of treated gasoline by refiners to licensed jobbers so as to enable it to exploit sales to the excluded group in some other way. Rather its restrictions result in the perpetual exclusion of non-licensed jobbers from the market of lead-treated gasoline, thus depriving its refiner licensees of the opportunity to sell to the excluded group.

In so far, therefore, as the provisions of the refiner license agreements are used to exclude from the market jobbers who do not maintain "business ethics", the court believes that they are not conditions "normally and reasonably adapted to secure pecuniary reward for the patentee's monopoly." United States v. General Electric Co., 272 U.S. 476, 490, 47 S.Ct. 192, 197, 71 L.Ed. 362.

The defendant corporation attempts to identify its position with that of a manufacturer or trader and contends that, as the latter possesses the privilege of selecting his own customers, see United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992, 7 A.L.R. 443, so the defendant corporation may select the jobbers to be licensed, upon any basis satisfactory to itself. This argument, however, ignores the fact that the defendant corporation is not selecting its own customers when it determines what jobbers may sell lead-treated gasoline. The Ethyl Gasoline Corporation manufactures tetraethyl fluid; its sole customers are its refiner licensees. Its selection of refiner licensees is not under attack. The jobber is in no sense a dealer in the article manufactured by this corporation. The jobber is a dealer in lead-treated gasoline, of which the defendant corporation produces merely an ingredient. It is the refiner and not the Ethyl Gasoline Corporation, who produces lead-treated gasoline. The government does not question the right of each refiner licensee to

make an independent selection of his jobber customers.

The facts of the case do not fall within the permissive provisions of the amendment to section one of the Sherman Anti-Trust Act effected by the Act of August 17, 1937, 50 Stat. 693, 15 U.S.Code, Sec. 1, 15 U.S.C.A. § 1, and the defendants do not contend that this amendment has any application to the facts of this case.

The court accordingly is of the opinion that the agreements between the Ethyl Gasoline Corporation and its refiner licensees restricting sales of treated gasoline to those jobbers only whom the former licenses, unreasonably restrain trade and are violative of the Sherman Anti-Trust Act.

The defendants accordingly will be enjoined from requiring jobbers to procure licenses for handling lead-treated gasoline and from requiring refiners to sell lead-treated gasoline to such jobbers only as defendant corporation licenses or otherwise designates.

Submit proposed findings of fact and conclusions of law in accordance herewith.